# EXHIBIT V

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -X

CELESTE WILLIAMS, LAUREN CRUZ, EMANUEL

O'NEALE, BRANDON STURMAN, LATRESHA HALL,

LAKEISHA MITCHELL, CHRISTINE BORBELY and

JANINE APONTE on behalf of themselves and

others similarly situated,

                Plaintiffs,

    -against-             Index No.

                         07cv3978

TWENTY ONES, INC., d/b/a THE 40/40

CLUB, SHAWN CARTER p/k/a JAY-Z,

JUAN PEREZ and DESIREE GONZALES,

                Defendants.

- - - - - - - - - - - - - - - - - - - - -X

                January 28, 2008

                9:54 a.m.


DEPOSITION of ANITA GILLETTE, a Plaintiff

herein, taken pursuant to Notice, and held

at the offices of Littler Mendelson, P.C.,

885 Third Avenue, New York, New York, before

Leeann Bertorelli, a Court Reporter and

Notary Public of the State of New York.

DALCO REPORTING, INC. 170 Hamilton Avenue, White Plains, New York 10501
914.684.9009 Fax 914.684.6561 info@dalcoreporting.com 800.DAL.8779
49 W 37th Street, New York, New York 10018 212.679.6095 dalcoreporting.com



ANITA GILLETTE

26

```
1        MS. SHEINKIN: Can you mark this as
2    D.
3
4        (Gillette Exhibit D,
5        ACKNOWLEDGEMENT FORM, was
6        marked for identification.)
7
8    Q.   Is this the acknowledgement form you
9    were referring to?
10   A.   I'm not sure if this is the form,
11   specifically. It was a booklet. It wasn't this.
12   It was like a booklet, employee manual.
13   Q.   And you signed something that you
14   had received it. This says, I have read and
15   understand the employee manual.
16   A.   I don't -- this -- I received an
17   employee manual, I believe. 30 to 45 days after I
18   worked there. This I signed, obviously.
19   Q.   Okay. This was signed on May 12th?
20   A.   Correct.
21   Q.   So this was when you began working
22   at the 40/40 Club?
23   A.   Correct.
24   Q.   So what documents are you referring
```

27

```
1    to when you say, I have read and understood the
2    employee manual?
3    A.   Like I said, I personally received a
4    document, which is big booklet, which was the
5    manual. I did not receive that until 30 to 45
6    days after I worked there. This document must
7    have been something that I signed.
8    Q.   But do you recall what you were
9    referring to when you said, I have read and
10   understood the employee manual?
11   A.   No.
12   Q.   When you signed this you hadn't read
13   and understood the employee manual?
14       MR. KIRSCHENBAUM: Objection.
15   A.   Well, this might be a part of a
16   different -- I don't know what manual you're
17   referring to. But I know as far as that big
18   handbook that we received, I didn't receive that
19   until 30 to 45 days after I started working.
20   This might be pertaining to something else.
21   Q.   But you don't --
22   A.   A smaller booklet or some other
23   information.
24   Q.   But you don't recall?
```

28

```
1    A.   No, I don't.
2    Q.   Did you go to regular staff
3    meetings?
4    A.   Yes.
5    Q.   How often?
6    A.   Every Monday.
7    Q.   And were they at the same time every
8    Monday?
9    A.   I think it's 5:00, I believe.
10   Q.   And who attended those meetings?
11   A.   Employees.
12   Q.   All employees?
13   A.   I think just front-of-the-house
14   employment.
15   Q.   Who would that consist of?
16   A.   Servers and bartenders. Yeah,
17   servers and bartenders.
18   Q.   So not all front of the house,
19   bussers weren't there?
20   A.   I don't think they were. I'm not
21   sure.
22   Q.   So only for servers and bartenders?
23   A.   Yes.
24   Q.   And those are the tipped employees?
```

29

```
1    A.   Yes, I believe so.
2    Q.   Who ran the meetings?
3    A.   Managers and/or the owner.
4    Q.   The "owner" referring to --
5    A.   Desiree.
6    Q.   Did employees also participate in
7    the meetings?
8    A.   Yes.
9    Q.   If they ever needed to raise any
10   comments or questions that you had?
11   A.   Uh-huh.
12   Q.   Sorry. Just so she can take it down
13   I need yes or no.
14   A.   Oh, yes.
15   Q.   What Shawn Carter ever present for
16   the meetings?
17   A.   No.
18   Q.   Was Juan Perez ever present?
19   A.   No, not at any meeting I attended.
20   Q.   And did you attend all the meetings
21   when you were scheduled to work on a Monday?
22   A.   I don't think -- I don't know if I
23   attended every single meeting. But I attended
24   the ones that I was required to attend. I
```

8  (Pages 26 to 29)

ANITA GILLETTE

30

1 attended the ones I could attend.
2    Q.   And you attend the meetings on days
3 that you were scheduled to work?
4    A.   Days you were scheduled to work, and
5 days you were not scheduled to work.
6    Q.   So you would come in --
7    A.   For the meeting.
8    Q.   Okay.  Then why would you not be
9 required to attend any particular meeting?
10    A.   Well, sometimes -- I don't know if I
11 attended every single one.  You're asking me if I
12 attended every single meeting; correct?
13    Q.   Uh-huh.
14    A.   Well, I'm not sure if I attended
15 every single meeting, that's what I'm saying.
16    Q.   Do you recall how many meetings that
17 you missed?
18    A.   I don't recall if I missed any or if
19 I didn't miss any.  I'm saying I don't know if I
20 attended every meeting.
21    Q.   Okay.  But you don't have any
22 recollection of not having attended any
23 particular meeting?
24    A.   Not specifically.

31

1    Q.   What time did the 40/40 Club open?
2    A.   I think 5, 4:30, something like
3 that.
4    Q.   Okay.  And what time did it close?
5    A.   4:00 on -- well, it depended.  I
6 mean sometimes they would close the restaurant,
7 the club, down early, if there was no business.
8 But on the weekends they close at 4.
9    Q.   So it would be during the weekdays
10 that the club would sometimes close early?
11    A.   Right.  Depending on who was there,
12 which manager was there.
13    Q.   What would the difference between
14 the manager be?
15    A.   What do you mean?
16    Q.   You said depending on which manager?
17    A.   Right.
18    Q.   Some managers were more likely to
19 close early than others?
20    A.   Right.  Or send you home.
21    Q.   Okay.  When the club closed early,
22 what time would that usually be?
23    A.   Maybe 2, 3.  I'm not sure.
24    Q.   After the club stopped serving,

32

1 which on the weekend would be 4, sometimes
2 earlier during the week.  Was there other work
3 that you had to perform?
4    A.   Yes.
5    Q.   What would you do?
6    A.   We had to clean the entire club.
7 You had to clean your area.  Everybody had to
8 help everybody else finish their area.  You were
9 stuck there until everything was done.
10    Q.   What did that consist of?
11    A.   Just basically cleaning your
12 section, making sure it was clean, fluffing
13 pillows and organizing pillows so they were
14 correct.  They had a format, making you clean the
15 side stations, that kind of thing, sweeping
16 everything.
17    Q.   How long did that take?
18    A.   Anywhere from an hour to two hours,
19 sometimes depending.  And you needed to wait to
20 get your money.  Everybody had to cash out.
21    Q.   Wait to get what money?
22    A.   Well, you had to, you know, organize
23 your money.  So then you had to wait for them to
24 take your money -- their house money.  So you had

33

1 to sit around and wait after you finish cleaning.
2    Q.   Who would you be giving that money
3 to?
4    A.   Desiree or Juan at certain times, or
5 the manager.
6    Q.   You were required to clock in and
7 out?
8    A.   Yeah.
9    Q.   And that was on POSitouch?
10    A.   Right.
11    Q.   So you would clock in, first thing?
12    A.   Uh-huh.
13    Q.   And then clock out?
14    A.   Yup.
15    Q.   And you needed to be clocked in in
16 order to take orders -- to take customer's
17 orders; correct?
18    A.   Correct.
19    Q.   When you clocked out, were you
20 required to report the tips that you had earned
21 that shift?
22    A.   Yes.
23    Q.   Could you clock out without
24 reporting your tips?

9 (Pages 30 to 33)

ANITA GILLETTE

34

1    A.  No, you couldn't.
2        Q.  And did you accurately report your
3    tips on POSitouch?
4        A.  Yeah, you're legally binded to
5    report eight percent of your tips; at that time
6    that was the law.
7        Q.  So you reported eight percent of
8    your tips?
9        A.  Well, it depended.  I don't
10   necessarily remember what I did on specific days.
11   I reported whatever I reported.  Whatever
12   documents indicate that most likely that's what I
13   reported.
14       Q.  Just so I understand, the number you
15   reported was based on a percentage of the tips
16   that you had earned?
17       MR. KIRSCHENBAUM:  Objection.
18   That's not what she said.
19       Q.  You can answer.
20       A.  All right.  I reported, you know,
21   basically whatever I reported on a specific day.
22       Q.  Well, when you were punching out,
23   I'm trying to understand, how you would determine
24   what number to put in?

35

1    A.  Well, like I said, it was legally
2    eight percent you were supposed to declare.  So
3    it would be based on a certain amount of money.
4    Whatever money I made it would be based on that.
5        Q.  But not necessarily always eight
6    percent.  Is there any reason you wouldn't put
7    eight percent, if that's what you were legally
8    required to do?
9        A.  No.  No reason to do that.
10       Q.  Did you understand that your tips
11   were considered income?
12       A.  Yes.
13       Q.  And they were subject to tax
14   withholdings?
15       A.  Correct.
16       Q.  And did you understand that the club
17   would withhold taxes on your tips from your
18   wages?
19       A.  Correct.
20       Q.  Other than what the club withheld,
21   did you ever pay any taxes for the tips you
22   earned at the 40/40 Club?
23       MR. KIRSCHENBAUM:  Objection.  That
24   question assumes something that my client

36

1    has no knowledge of.
2        MS. SHEINKIN:  The question was
3    whether or not she paid taxes.
4        MR. KIRSCHENBAUM:  You said other
5    than what the club withheld.  She has no
6    way of knowing that the club withheld any
7    money or did not withhold any money.
8        Q.  Ms. Gillette, I know you said you
9    understood that the club withheld taxes on your
10   tips from your wages; correct?
11       A.  Right.  All employers do that.
12       Q.  Okay.  So other than that amount,
13   did you ever pay any taxes for the tips you
14   earned at the 40/40 Club?
15       A.  To the government?
16       Q.  Yeah.
17       A.  No.
18       Q.  Did you ever forget to clock in?
19       A.  I may have.
20       Q.  Well, could you have -- I guess you
21   said you couldn't take orders unless you clocked
22   in?
23       A.  Correct.
24       Q.  So then would it be possible for you

37

1    to not clock in?
2        A.  Correct.
3        Q.  Correct?  It would not be possible?
4        A.  Well, like you said, if you can't
5    take orders unless you clocked in, then,
6    obviously, I must have clocked in.
7        Q.  Did you ever forget to clock out?
8        A.  I don't believe so.
9        Q.  You don't recall any time when you
10   forgot to clock out?
11       A.  No. I don't recall.
12       Q.  Do you know what the policy was if
13   you did forget to clock out?
14       A.  Not off the top of my head.  I don't
15   know.  Actually, I don't know.
16       Q.  What's the latest that you ever
17   worked at the 40/40 Club?
18       A.  Latest time I left and clocked out?
19   Probably, 7.
20       Q.  When was that?
21       A.  I don't know.
22       Q.  How often do you think you worked --
23   stayed until 7?
24       A.  Sporadically.

ANITA GILLETTE

46

1    Q.   And you also had them sign the
2  credit card?
3    A.   Correct.
4    Q.   Was there a minimum amount that a
5  customer had to buy for a credit card purchase?
6    A.   I don't remember if there was or was
7  not.
8    Q.   Okay.  And before presenting the
9  bill you added a 20 percent gratuity?
10    A.   Correct.
11    Q.   And you did that to every order?
12    A.   Yeah, pretty much.
13    Q.   What do you mean "pretty much"?
14    A.   I think every order we pretty much
15  added 20 percent.  I mean, like I said -- so I
16  think there might have been one or two times
17  maybe -- about five times where you use your
18  discretion.  You figure you'd make more money by
19  not doing that.  If one person ordered a drink
20  you wouldn't put 20 percent on there; it wasn't
21  going to be much.
22    Q.   So the only time you would put 20
23  percent is if you thought you could get more?
24    A.   Right.

47

1    Q.   A greater amount of tip by leaving
2  it off?
3    A.   Yup.
4    Q.   And there was a function on
5  POSitouch that permitted you to add the 20
6  percent?
7    A.   Correct.
8    Q.   Okay.  If a customer paid you and
9  gave you cash, what did you do with the money?
10    A.   You would hold it.
11    Q.   Okay.  Were you wearing an apron --
12    A.   Yeah.
13    Q.   -- or you had something, and you
14  just kept all the money in there?
15    A.   Correct.
16    Q.   And that included the sale amount
17  and the tip?
18    A.   Right.
19    Q.   Did you keep them separate or
20  together?
21    A.   Varied.  It depends.  It depends on
22  how I felt.  Sometimes I put the cash away.  I
23  think, primarily, I kept it all together.
24    Q.   Okay.  And what would you do with

48

1  the credit card receipt?
2    A.   What would I do with it?
3    Q.   Uh-huh.  Would you also hold that?
4    A.   Yeah.
5    Q.   And you hold those for the entire
6  night?
7    A.   Shift, uh-huh.
8    Q.   Until the end of your shift.  So you
9  were holding your money and the clubs money
10  through your shift.
11    A.   Correct.
12    Q.   Okay.  And then at the end of the
13  shift, what was the process?
14    A.   You would -- well, you mean like as
15  far as --
16    Q.   Like a cash out.
17    A.   Cash out.  So you'd print your
18  report, and then you would do the normal
19  deduction.  I don't remember what the specifics
20  were.  But you would then separate your money
21  from the house's money.
22    Q.   What do you mean by "the normal
23  deduction"?
24    A.   Well, you have to tip out the

49

1  bartender.  I think -- I don't know if we had a
2  busser system.  I'm not sure.
3    Q.   Okay.  So you were required to tip
4  out to some employees?
5    A.   Uh-huh.
6    Q.   And you would do that before cashing
7  out?
8    A.   During your cash out you would
9  separate -- you would separate your house, and
10  then what you earned in tips.  And from what you
11  earned in tips you'd separate what you were
12  taking home, and what you were giving out to
13  other employees.
14    Q.   Okay.  Which employees did you tip
15  out?
16    A.   Bartenders, and I'm not sure if we
17  had bussers.  I don't remember.
18    Q.   How much did you tip out to the
19  bartenders?
20    A.   I don't know.
21    Q.   You don't recall?  So you would
22  print your report, and then you said you would
23  give the club their money?
24    A.   Right.

13 (Pages 46 to 49)

ANITA GILLETTE

50

1    **Q.  And you kept all of the tips that**
2  **you had earned during the night?**
3    A.  No. I gave part of the tips.
4    **Q.  Other than what you tipped out?**
5    A.  Correct.
6    **Q.  And concerning the credit card**
7  **receipts, you would hold on in cash to whatever**
8  **amount you had earned in tips on credit cards?**
9      MR. KIRSCHENBAUM:  Objection.
10  That's not what she said.
11      MS. SHEINKIN:  I'm asking a
12  question.
13      MR. KIRSCHENBAUM:  All right.
14    A.  I'm sorry. Can you repeat the
15  question.
16    **Q.  When you were going through the cash**
17  **out process, you had cash and you had credit card**
18  **receipts.**
19    A.  Uh-huh.
20    **Q.  Would you deduct the amount of the**
21  **credit card tips you had received from the amount**
22  **of cash you were turning over to the club?**
23    A.  I'm not sure what the process was.
24  But I know that you received the payment. If

51

1  somebody tipped you on the credit card, you
2  receive that money. I'm not sure if they gave it
3  to you afterwards or prior; I don't remember the
4  details.
5      But you received what you earned on
6  the tips, unless there was a problem with the
7  credit card transaction. If they felt that it
8  wasn't sufficient then they would take your
9  money.
10    **Q.  And you're still referring to the**
11  **cash out procedure?**
12    A.  Right.
13    **Q.  What would be a problem with the**
14  **credit card?**
15    A.  If they felt the signatures weren't
16  enough or you missed, you know, you didn't take a
17  number down, or something was off.
18    **Q.  And when you say "they would take**
19  **your money," who --**
20    A.  Management.
21    **Q.  -- are you referring to?**
22    A.  Management.
23    **Q.  Was there somebody in particular you**
24  **were working with?**

52

1    A.  Either the owners or the managers at
2  the time.
3    **Q.  What -- who are you referring to by**
4  **"owners"?**
5    A.  Desiree.
6    **Q.  Anyone else?**
7    A.  Well, the owners, they're
8  collectively together, so.
9    **Q.  But you're referring to Desiree --**
10    A.  Correct.
11    **Q.  -- as the person?**
12    A.  Correct.
13    **Q.  Did that happen to you?**
14    A.  Yes.
15    **Q.  How many times?**
16    A.  I think three -- about three times.
17  Maybe three or four times. I'm not sure. I
18  remember the first time it happened.
19    **Q.  All right.  Tell me about that.**
20  **When was that?**
21    A.  It was the first day I worked.
22    **Q.  Your first day?**
23    A.  Uh-huh. First day I worked by
24  myself, like taking care of my own separate --

53

1    **Q.  After training?**
2    A.  Right. Uh-huh. They -- well, she
3  didn't feel like it was sufficient. She took
4  $70, I believe, from me at that specific time.
5    **Q.  Did you receive a write-up?**
6    A.  I didn't sign documents that day,
7  no.
8    **Q.  What did the $70 --**
9    A.  It was the total amount of the
10  check, I believe.
11    **Q.  And that was with Desiree?**
12    A.  Yes.
13    **Q.  And what was the problem with the**
14  **credit card?**
15    A.  I don't remember the specifics, but
16  there was an error made on my account. So she
17  took the check -- the value of the check.
18    **Q.  But you don't have any documents**
19  **evidencing that?**
20    A.  They gave me the receipt and said
21  come back. And I think -- I don't remember. I
22  was told it was 90 days, but I don't remember the
23  time period they told me initially. But they
24  said, take this and come back for your money

14 (Pages 50 to 53)

ANITA GILLETTE

54

1  after the credit card clears with the bank.
2      Q.  Did you do that?
3      A.  I went back, but nobody said
4  anything.
5      Q.  You went back to --
6      A.  I asked the manager about it.
7      Q.  What manager?
8      A.  David.
9      Q.  Do you recall his last name?
10     A.  No.
11     Q.  And what did you say?
12     A.  I said, so am I going to ever get
13  this credit card money back, and he said, I don't
14  know.
15     Q.  Did you ever follow up?
16     A.  No.
17     Q.  Did he give you any other
18  information?
19     A.  No, not specifically.
20     Q.  Did you ever ask Desiree about it?
21     A.  No.
22     Q.  So you still have that receipt?
23     A.  No.
24     Q.  What did you do with it?

55

1      A.  I discarded it most likely. I don't
2  have it.
3      Q.  You looked for it?
4      A.  Not specifically. I don't think I
5  would have that after all this time. It was a
6  credit card receipt, or a copy or something that,
7  you know, showed that they took that money from
8  me.
9      Q.  Okay. So there were two other
10  times?
11     A.  Yes.
12     Q.  When was the second time?
13     A.  I don't remember the day.
14     Q.  How long after you started working?
15     A.  Maybe a month or something like
16  that. I'm not sure.
17     Q.  And what were the circumstances?
18     A.  I don't remember that incident.
19     Q.  You don't remember anything about
20  it?
21     A.  No.
22     Q.  Do you remember who took the money?
23     A.  No.
24     Q.  Do you remember how much it was?

56

1      A.  I don't remember the amount either.
2  I think it was like -- I think it was the tip.
3  It wasn't even the bill. I think it was the tip
4  that was on there.
5      Q.  So they only held the amount of your
6  tip?
7      A.  Right. The second time.
8      Q.  And did you go back after 90 days to
9  ask for that money?
10     A.  No.
11     Q.  Why not?
12     A.  Because at that time I had already
13  become accustomed to the practices there. So I
14  knew I wasn't getting the money back.
15     Q.  Well, that was just the second time
16  it happened; right?
17     A.  Right.
18     Q.  And you never had asked Desiree the
19  first time about the money?
20     A.  Correct.
21     Q.  And when was the third time?
22     A.  I was doing a party with another
23  person. We had -- we were pooling tips. And
24  then there was an error made on our accounts. I

57

1  think it was in the sum of 200. Something over
2  $200 that we had lost.
3      Q.  So $200 that club didn't receive?
4      A.  That they took from us.
5      Q.  Who was the other person you're
6  referring to?
7      A.  Some girl. I don't remember her
8  name.
9      Q.  Can you describe her?
10     A.  As far as what?
11     Q.  What she looked like?
12     A.  She was -- black or brown hair.
13  She's African American. I think she spoke
14  Spanish. She might have been Dominican heritage.
15     Q.  She was another server?
16     A.  Yes.
17     Q.  And do you recall the party?
18     A.  I don't think it was a party. I
19  think we were working a specific area.
20     Q.  Okay. And you pooled your tips
21  together?
22     A.  Right.
23     Q.  And do you know which one of you it
24  was that didn't follow the credit card

ANITA GILLETTE

82

1    A.  I think it was just what you -- what
2  the money was, and then zero dollar amount.
3      Q.  Did it have hours indicated?
4    A.  It may have.  I believe it may have.
5      Q.  Did you ever ask why the amount was
6  zero?
7    A.  No.
8      Q.  Did you have an understanding of why
9  the amount was zero?
10   A.  No.
11     Q.  I believe you said it was common
12 practice at restaurants to withhold the taxes
13 from your tip amount?
14   A.  Right.  But it's impossible for you
15 to earn a certain amount of money, and then for
16 it to be taxed out that way.
17     Q.  That's impossible?
18   A.  Well, I mean that's my understanding
19 of it.
20     Q.  So that's never happened to you at
21 any other restaurant?
22   A.  Some places where you received a low
23 check, like maybe a $12 check or a $40 check.
24     Q.  But never zero?

83

1    A.  Not that I remember, any specific
2  restaurant where I worked where I received no
3  money at all.
4      Q.  Are there restaurants that you
5  worked at where you made more in tips than at the
6  40/40 Club?
7    A.  Some were pretty close.
8      Q.  Where?
9    A.  Josie's.
10     Q.  Is that it?
11   A.  Yeah, pretty much.
12     Q.  "Pretty close," do you mean as much
13 or --
14   A.  Like as far as like 200-, $300 a
15 night, yeah.  That's close.  That's as close as
16 it got.
17     Q.  So you made $200 a night less at
18 Josie's?
19   A.  No, I'm saying as far as when I made
20 two to $300 at the 40/40, it was similar to what
21 I was making at the other restaurant.
22     Q.  Was that an average night, 200-,
23 $300, or was that a low night?
24   A.  At what restaurant?

84

1    Q.  At the 40/40 Club.
2    A.  That's pretty average for me,
3  specifically.  Other people made more money.
4    Q.  Why is that?
5    A.  They had better sections.
6    Q.  How much did you typically make a
7  week in tips at the 40/40 Club?
8    A.  I'd say anywhere between, depending
9  on the week, anywhere between $600 to like $800,
10 I think.
11   Q.  In Paragraph 4 of your declaration,
12 you say that you received tips, and that with
13 conversations with other employees you know it
14 was the common practice of defendants not to pay
15 employees who received a tip a minimum wage?
16   A.  Right.
17   Q.  Who were you referring to, that you
18 had conversations with?
19   A.  Other employees.  Like the ones I
20 indicated before.
21   Q.  Larry?
22   A.  Right.
23   Q.  Do you recall anyone else you had a
24 conversation with on this?

85

1    A.  No, not specifically.  I mean just
2  general conversation.  We all complained about
3  not receiving any kind of paycheck.
4    Q.  Did you ever raise that issue at a
5  staff meeting?
6    A.  No.  I don't believe I did, no.
7    Q.  Did anyone at the meetings you were
8  present at?
9    A.  They may have.  I don't remember.  I
10 don't think so though.
11   Q.  Did you ever put a complaint into
12 the complaint box?
13   A.  No.
14   Q.  So you don't recall any specific
15 conversations about not receiving wages with
16 anyone other than Larry?
17   A.  I remember that specific situation
18 speaking with him about that.  The connotation of
19 the conversation.
20   Q.  I'm sorry.  The connotation?
21   A.  The connotation of the conversation,
22 basically what was said.  This is how things are,
23 and that you don't receive a paycheck, basically.
24 And that you only get tips.

22 (Pages 82 to 85)

ANITA GILLETTE

94

1    A.   Okay.

2    Q.   It says, the 40/40 Club did not

3  require us to fill out any sort of tip

4  declaration.

5    A.   No.

6    Q.   But you did declare your tips?

7    A.   At the end on the POSitouch.

8    Q.   So you were required to declare

9  tips?

10    A.   Yeah, but there was no form.

11    Q.   Okay. But you declared your tips?

12    A.   Right.

13    Q.   And at the end of the paragraph you

14  say, based on the tips given to you and was

15  eventually paid to you, you believe you didn't

16  receive all of your tips due?

17    A.   Right. I didn't receive the tips

18  due for the parties that I worked. I did not

19  receive checks afterwards.

20    Q.   So if you received a check or were

21  given cash, you were given all the money that you

22  were due for that party?

23    MR. KIRSCHENBAUM: Objection. She

24  didn't say that.

95

1    MS. SHEINKIN: It's a question.

2    Q.   You can answer.

3    A.   So I received the money that I, you

4  know, like I wait on tables. And I received the

5  money that I earned for that day. But if there

6  was a party, that money I did not receive until

7  later. That's what I'm saying.

8    Q.   So your complaint is that you didn't

9  receive the tip money right away?

10    A.   For some events. For some parties,

11  correct.

12    Q.   But that eventually you did receive

13  that money?

14    A.   For some of them. Some of them I

15  just didn't keep track of the money, because I

16  had left. And I knew I wasn't getting it back.

17    Q.   So the only parties you didn't

18  receive payment for are parties that would have

19  been paid after you had left?

20    A.   After the fact. After the fact of

21  the party.

22    Q.   Was it after you left employment?

23    A.   Yeah, I left, and I didn't go back

24  to the money. Because other people had come back

96

1  for the money, and we were standing there, and we

2  all were kind of like in shock because they

3  weren't -- there were several people. I remember

4  two people, specifically one guy who stood there

5  for probably an hour, waiting for somebody to

6  give him the money. And we just stood there and

7  watched him stand there.

8    Q.   The day of the party?

9    A.   No, this was before, when I was

10  working there. I knew that once you quit, you

11  weren't going to get your money back, basically.

12    Q.   But you never went to get your

13  money?

14    A.   Well, why would I go get money that

15  I knew I wasn't going to receive.

16    Q.   Well, your knowledge for not

17  receiving it is based on?

18    A.   I worked there for that period of

19  time. And everybody who came back left there

20  after a week of working or wherever, never

21  received their money. While people worked there,

22  they said they never received money. When I

23  started people complained about they never

24  received money. So I wasn't going to go back and

97

1  stand there and wait for one of them to give me

2  money that I knew I wasn't going to receive.

3  Because nobody else received it. And I'm not

4  going to think that they would make an exception

5  for myself.

6    Q.   Who is it that you're referring to?

7    A.   Some guy, I don't know. He worked

8  there maybe a week or two. And I remember he

9  came back. And I was -- I think I had opened

10  that day. It was around 6:00 maybe, and he came

11  in earlier and stood there.

12    Q.   Okay. But before you left your

13  employment with the 40/40 Club, you had received

14  the amount of money for all the tips for

15  parties --

16    A.   If the party --

17    Q.   If the party were paid prior to the

18  time you left your employment?

19    A.   Right.

20    Q.   And just to clarify, you never

21  called anyone at the club to see if you could

22  come in and pick up the --

23    A.   No.

24    Q.   -- additional tips? And you never

25 (Pages 94 to 97)

ANITA GILLETTE

102

1    A.  I strongly don't believe I signed
2  any kind of paperwork.
3    **Q.  What about the sales report or --**
4    A.  I think I held on to something that,
5  you know, was evidence that something was taken
6  away from me.
7    **Q.  But you no longer have that**
8  **document?**
9    A.  No.
10    **Q.  You referred to experiences of other**
11  **employees at the 40/40 Club having tips retained.**
12  **What employees are you referring to?**
13    A.  Other employees that worked there.
14    **Q.  Do you have specific knowledge of**
15  **any other employee having their tip retained**
16  **because of a credit card dispute?**
17    A.  I'm not sure it's credit card.  I
18  know like the young lady I spoke of, LaToya, I
19  know she had issues with money being taken away
20  from her.
21    **Q.  What were the circumstances?**
22    A.  I don't recall.
23    **Q.  What's the basis for your knowledge?**
24    A.  She told me.

103

1    **Q.  So not anything you witnessed**
2  **firsthand?**
3    A.  I think I might have been there the
4  same day, but I don't remember the specifics.
5    **Q.  But your knowledge is based on what**
6  **she said to you?**
7    A.  Right.  Conversations we had.
8    **Q.  What did she say to you?**
9    A.  That she was owed money, basically.
10    **Q.  But you don't know what she was owed**
11  **money for?**
12    A.  I don't remember specifically.
13    **Q.  And you don't recall when that**
14  **conversation occurred?**
15    A.  During my employment.  I don't
16  remember specifically the day.
17    **Q.  Were you ever required to pay for**
18  **any breakage or spills?**
19    A.  No.
20    **Q.  Did you ever break anything?**
21    A.  Not that I remember -- well, I don't
22  know.
23    **Q.  Did you ever spill anything?**
24    A.  Yeah.

104

1    **Q.  But you weren't required to pay for**
2  **it?**
3    A.  I don't think so, no.  No.
4    **Q.  You say that you personally**
5  **witnessed this happen to another employee?**
6    A.  Yeah, I think a girl -- I think
7  either something happened with a bottle of
8  champagne, and I think the house made her pay for
9  it.
10    **Q.  What girl?**
11    A.  I don't remember.
12    **Q.  Was it a server or a bartender?**
13    A.  Server.
14    **Q.  And you saw the bottle break?**
15    A.  No.  She -- I think it was something
16  she said afterwards.
17    **Q.  So you did not personally witness**
18  **it?**
19    A.  No.
20    **Q.  So that's a false statement in**
21  **Paragraph 14, where you say you personally**
22  **witnessed this happen to another employee?**
23        MR. KIRSCHENBAUM:  Objection.
24    That's a misconstruance.

105

1    **Q.  That's false; right?**
2        MR. KIRSCHENBAUM:  Objection.
3    **Q.  You can answer.**
4    A.  Well, because the person indicated
5  to me that it happened during the shift.  So I
6  was there when it happened.  I wasn't
7  specifically -- wasn't there during the breakage.
8    **Q.  Were you there when she was paying**
9  **for it?**
10    A.  Yeah, during cash out, she -- I
11  think we were all like near each other.  And I
12  know that she definitely came out-of-pocket.  I
13  mean she paid.
14    **Q.  Because she told you that?**
15    A.  Yeah, well, she took out separately.
16  She did it.
17    **Q.  Did you see her hand someone the**
18  **money for the breakage?**
19    A.  I don't recall seeing her hand
20  anybody money, but I know she said she did.
21    **Q.  Did she tell you how much she paid?**
22    A.  I think it was the sum of the
23  bottle.
24    **Q.  Do you know who she paid that money**

27 (Pages 102 to 105)

ANITA GILLETTE

**106**

1  to?
2     A.  The house.
3     Q.  In particular --
4     A.  The restaurant.
5     Q.  -- who she handed the money to?
6     A.  I don't know.
7     Q.  Because you weren't there?
8         MR. KIRSCHENBAUM:  Objection.
9     That's not what she said.
10    Q.  Is it because you weren't there?
11    A.  I was there on the day it happened.
12  I wasn't in the room when she handed the money
13  over, no.
14    Q.  Does Shawn Carter have an office in
15  the club?
16    A.  Not that I was aware of.
17    Q.  Did Juan Perez have an office in the
18  club?
19    A.  Yeah, in the back.
20    Q.  Where that was office?
21    A.  Behind the front office.
22    Q.  Was that his personal office?
23    A.  I guess a personal lounge area.  I
24  don't know if it was an office.  I don't remember

**107**

1  seeing a desk.  It was like a couch, and some
2  baseball stuff.
3     Q.  So just an area to spend time in?
4     A.  Uh-huh.
5     Q.  You didn't see him working there?
6     A.  No.
7     Q.  Have you ever met Shawn Carter?
8     A.  Well, I've seen him come in the
9  restaurant and go upstairs, that's about it.
10    Q.  You've never spoken with him?
11    A.  No.
12    Q.  He's never instructed you to do
13  anything?
14    A.  No.
15    Q.  Do you have knowledge of any
16  employee at the club that's been hired or
17  promoted by Mr. Carter?
18    A.  No.
19    Q.  Do you have knowledge of any
20  employee that's been disciplined or terminated by
21  Mr. Carter?
22    A.  No.
23    Q.  Do you have knowledge of any club
24  policies or procedures that were set by Mr.

**108**

1  Carter?
2     A.  No.
3     Q.  But you have met Juan Perez before?
4     A.  Yes.
5     Q.  And have you had discussions with
6  him?
7     A.  Not conversations.  Maybe hello,
8  that kind of thing, or like, you know, thank you
9  from me -- certain people had to wait on his
10  section -- well, not his section, but wait on
11  him.  So you just go in and like ask him what he
12  wanted.  And he'd just tell you, I want this:  I
13  want that.  And that's basically all I can
14  remember ever talking to him about.  That kind of
15  stuff.
16    Q.  So other than giving you food or
17  drink orders, did he ever instruct you to do
18  anything else?
19    A.  No.
20    Q.  Do you have any knowledge of any
21  employees in the club that he hired or promoted?
22    A.  No.
23    Q.  Do you have knowledge of any
24  employee that has been disciplined or terminated

**109**

1  by him?
2     A.  No.
3     Q.  Do you have knowledge of any club
4  policies or procedures that Mr. Perez set?
5     A.  No.
6     Q.  Do you have any knowledge of any
7  control at all, either by Shawn Carter or Juan
8  Perez, over your employment at the club?
9     A.  Control over, like my position?
10    Q.  Yeah.
11    A.  No.
12    Q.  Since you left the 40/40 Club, have
13  you had conversations with any current or former
14  employees concerning your claims in this lawsuit?
15    A.  Uh-huh.
16    Q.  Who?
17    A.  LaToya.
18    Q.  Anyone else?
19    A.  No, not that I can remember, no.
20    Q.  When did your conversation with
21  LaToya occur?
22    A.  Initially when I called.  I called
23  her and left a message.  And asked her if she was
24  interested.  And she said no.  She wasn't