# EXHIBIT X

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -X

CELESTE WILLIAMS, LAUREN CRUZ,

EMANUEL O'NEALE, BRANDON STURMAN,

LATRESHA HALL, LAKEISHA MITCHELL,

CHRISTINE BORBELY and JANINE APONTE

on behalf of themselves and others

similarly situated,

        Plaintiffs,

  -against-                  Index No.

                                  07cv3978

TWENTY ONES, INC., d/b/a THE 40/40

CLUB, SHAWN CARTER p/k/a JAY-Z,

JUAN PEREZ and DESIREE GONZALES,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - -X

        January 22, 2008

        11:11 p.m.

DEPOSITION of THERESE RAZ, a Plaintiff herein, taken pursuant to Notice, and held at the offices of Littler Mendelson, P.C., 885 Third Avenue, New York, New York, before Leeann Bertorelli, a Court Reporter and Notary Public of the State of New York.

DALCO REPORTING, INC. 170 Hamilton Avenue, White Plains, New York 10601
914.684.9009 Fax 914.684.6561 info@dalcoreporting.com 800.DAL.8779
49 W 37th Street, New York, New York 10018 212.679.6095 dalcoreporting.com



18

1  A. Yes.
2  Q. Would they pay in cash at that time?
3  A. If they had cash, or if they wanted
4  to pay with a card.
5  Q. They could open a tab?
6  A. They could open a tab.
7  Q. How would you do that?
8  A. I would ask the customer if they
9  want to leave it open or close it. If they
10 wanted to close it, I would open up a tab, put
11 the name of the customer. You would have to make
12 an imprint of the credit card as well.
13 Q. You would take their credit card if
14 they wanted to open a tab?
15 A. And ID, yes.
16 Q. And identification? And at that
17 point you would take an imprint of the credit
18 card?
19 A. Yes.
20 Q. Would you also swipe it at that
21 time?
22 A. Yes.
23 Q. And you would hold it then
24 throughout the night until they were ready to

19

1  close their tab?
2  A. Right. If it was over a hundred
3  dollars, we would have to have them sign the
4  imprint, the driver license ID number as well.
5  Q. Did people also order food from you?
6  A. Yes.
7  Q. Did you follow the same procedures?
8  A. Yes.
9  Q. If someone paid cash, did you
10 include a tip in the amount of the order?
11 A. If it was over $30 we were able to
12 add gratuity to it.
13 Q. How much?
14 A. 20 percent.
15 Q. And you would do that automatically?
16 A. Yes.
17 Q. Would you inform the customer of
18 their gratuity?
19 A. Yes.
20 Q. Did anyone ever refuse to pay that
21 amount?
22 A. Yes.
23 Q. Someone refused to pay that?
24 A. Yeah. We would show them on the

20

1  check, and some people would dispute it.
2  Q. And what would happen in that case?
3  A. I would tell them this is how it
4  goes. This is the policy. If they continue to
5  argue, then at that point I would call a manager
6  over. And then either they pay for it, or they
7  don't. We don't really make them pay, because
8  it's gratuity, so.
9  Q. When you received a cash tip, what
10 did you do with that amount?
11 A. We would put it in a tip bucket.
12 Q. Would all the bartenders use the
13 same tip bucket?
14 A. Yes.
15 Q. What would you do with your credit
16 card tips?
17 A. We waited at the end of the night to
18 make sure it cleared, and then we would receive
19 it at the end of the night when we changed our
20 singles.
21 Q. At each night you received all of
22 your credit card tips?
23 A. Yes.
24 Q. Did the bartenders share their tips?

21

1  A. Yes.
2  Q. How did that process work?
3  A. We put everything together, add it
4  up, make a tip out to our barbacks, and then
5  split it among how many bartenders were working
6  behind the bar.
7  Q. Would that be for all the bartenders
8  in the restaurant --
9  A. No.
10 Q. -- or for particular bars?
11 A. Only for a particular bar.
12 Q. Each bar would pool among
13 themselves?
14 A. Yes.
15 Q. And what would you tip out to the
16 barbacks?
17 A. 20 percent.
18 Q. And did you also receive a
19 percentage of tips from servers?
20 A. Yes, if -- only on the weekdays.
21 Weekends, they would go to the service bar. So
22 during the week, if waitresses came to the
23 bartenders to get drinks, they would give us a
24 tip out.

THERESE RAZ

### 22

1  Q. So the service bars weren't opened
2  every day?
3  A. No.
4  Q. Was it only Friday and Saturday?
5  A. Only -- or if there's a big event
6  during the week.
7  Q. And during the weekdays when the
8  service bar wasn't open, servers would come to
9  regular bars for their drinks?
10 A. Only the main bar, if it was
11 downstairs.
12 Q. And on those occasions the
13 bartenders would receive a tip out from servers?
14 A. Yes.
15 Q. But during the weekends the main bar
16 would not receive a tip out?
17 A. No.
18 Q. The service bartenders would?
19 A. Yes.
20 Q. Did the service bartenders pool
21 their tips --
22 A. No.
23 Q. -- with other bartenders?
24 A. Actually except for the mez -- the

### 23

1  upstairs bartender would pool with the mez bar.
2  Q. What do you mean by the "mez bar"?
3  A. The mezzanine bar is the upstairs
4  bar, which is -- they serve the customers. Then
5  you have your mezzanine service bar, which only
6  serves the waitresses. And at the end of the
7  night that service bartender would pool with the
8  mez bartender.
9  Q. Were there regular staff meetings?
10 A. Yes.
11 Q. How often?
12 A. Once a week.
13 Q. What day of the week was that?
14 A. Monday.
15 Q. Who would attend those meetings?
16 A. The whole staff.
17 Q. Would back of the house employees
18 attend that meeting?
19 A. No.
20 Q. So just service staff?
21 A. Servers and waitresses.
22 Q. Bartenders?
23 A. And bartenders, yes.
24 Q. Did the runners and barbacks attend

### 24

1  those meetings?
2  A. No.
3  Q. So just servers and bartenders only?
4  A. Yes.
5  Q. Who ran the meeting?
6  A. It would be Des, or if she wasn't
7  available, it would be a manager.
8  Q. And what was discussed at those
9  meetings?
10 A. Just how the weekend -- cause
11 usually the weekends are busy. So if anything
12 went wrong, you know, we tried to fix it that
13 day, so it doesn't happen again. That's how
14 everything went during the week, any changes.
15 Q. Did employees have an opportunity to
16 ask any questions that they have?
17 A. Yes.
18 Q. Raise any concerns that they might
19 have?
20 A. Yes.
21 Q. Was Shawn Carter ever present for a
22 staff meeting?
23 A. No.
24 Q. Was Juan Perez ever present for a

### 25

1  staff meeting?
2  A. No.
3  Q. Can you explain to me what you would
4  do with your drawer at the end of your shift?
5  A. They -- the manager at that time
6  would just take the register and count it
7  themselves. And then we would just wait at the
8  end of the night to see if it's on point, like
9  even.
10 Q. How long would you have to wait?
11 A. A while. Maybe an hour, two.
12 Q. Did you have to wait at the
13 restaurant, or could you come back the next day
14 to find out?
15 A. No, we would have to wait.
16 Q. And what would happen if your drawer
17 was short?
18 A. Depending on how much it was, we
19 would give the money back. And then we would get
20 a warning. If it was short again, we would get a
21 second warning saying after that, you would get
22 fired if it was short again.
23 Q. You said it depended on how short it
24 was?

7 (Pages 22 to 25)

### 30

1 worked there?
2   A. Yeah.
3   Q. And what time would that ordinarily
4 be?
5   A. At the latest maybe 3, 2:30.
6 Between 2 and 3.
7   Q. And how long would you have to wait
8 in order to have your drawer counted, and make
9 sure that everything was clear?
10   A. During the week?
11   Q. Uh-huh.
12   A. Not too long, maybe an hour.
13   Q. Was it different on the weekend?
14   A. Yeah, because there was a lot more
15 that they have to go through, as far as servers
16 and bartenders.
17   Q. So how long would it be on the
18 weekends?
19   A. About an hour or two.
20   Q. An hour or two? So to 5 or 6:00.
21   A. Yes.
22   Q. And you punched in every time you
23 started working at the 40/40 Club?
24   A. Yes.

### 31

1   Q. Was that on the POSitouch system?
2   A. Yes.
3   Q. And did you do that regardless of
4 which bar you were at?
5   A. Punch in at any of the POSitouch
6 systems? Yeah, it didn't really matter where you
7 punched in.
8   Q. But you were required to do that
9 every day?
10   A. Yes.
11   Q. And also to punch out?
12   A. Yes.
13   Q. And when you punched out, did you
14 record your tips?
15   A. We recorded a percentage of our
16 sales. That's what I was told that's how they
17 punched out. Bartenders -- the bartenders who
18 worked there said that you would punch out your
19 tips depending on your percentage of sales.
20   Q. Other bartenders told you that?
21   A. Yes.
22   Q. What percentage of sales did you
23 use?
24   A. Ten percent.

### 32

1   Q. And you put in that number
2 regardless of the tips that you received?
3   A. Yes.
4   Q. Did you take breaks during your
5 shift?
6   A. No.
7   Q. What about just to use the restroom?
8   A. It was hard, because you couldn't
9 really leave your station unattended.
10   Q. What about for meals?
11   A. No.
12   Q. Did you eat at all your during
13 shift?
14   A. I tried kind of.
15   Q. So you could sometimes take a break
16 to have a meal?
17   A. During that -- during the week if it
18 wasn't busy, and someone was able to watch your
19 bar, if there was another bartender, then yes.
20 But on the weekends it was busy, no.
21   Q. Did you punch out during the time
22 you were taking those breaks?
23   A. No.
24   Q. How long were the shifts that you

### 33

1 generally worked?
2   A. Pretty much open to close.
3   Q. How long would that be; how many
4 hours a day?
5   A. About nine to ten hours.
6   Q. So you typically worked between nine
7 to ten hours a day?
8   A. Yes.
9   Q. Were there occasions that you
10 believe you worked more than ten hours in a day?
11   A. Yes, on the weekends.
12   Q. On all weekends or just
13 occasionally?
14   A. Occasionally.
15   Q. That was the exception to the
16 general rule of working between nine and ten
17 hours?
18   A. Yes. We would have to make like --
19 some of the calls coming in would be maybe come
20 in at 7.
21   Q. I'm sorry. What was that?
22   A. Coming in at 7. Majority of the
23 time we would have to come in at 4:30 or 4.
24   Q. Uh-huh.

### 34

1  A. But that's to open the bar. Then
2  during the -- then depending on a couple of days,
3  you could come in at 7 or later, depending on the
4  bar you're working at.
5  Q. A couple days during the week or the
6  weekend?
7  A. Weekend.
8  Q. Okay. Do you recall any specific
9  day that you worked more than ten hours?
10  A. Not specific.
11  Q. Do you have any knowledge concerning
12  the hours worked by any other employees at the
13  40/40 Club?
14  A. Meaning did they have issues?
15  Q. Do you have knowledge about what
16  hours they worked?
17  A. No.
18  Q. Did you take any vacations while you
19  were working there?
20  A. No.
21  Q. How was your schedule relayed to
22  you?
23  A. How would it relate to my --
24  Q. How did you become aware of what

### 35

1  your schedule was each week?
2  A. We would get our schedule each week
3  at the meeting.
4  Q. Who gave that to you?
5  A. Des or the manager.
6  Q. Do you know who created the
7  schedule?
8  A. Des.
9  Q. Did you ever need to request a
10  change to your schedule?
11  A. Every week we fill out a form saying
12  what we can and cannot work, what days.
13  Q. You were filling that out for the
14  following week or for the current week schedule?
15  A. For the following week.
16  Q. What if you needed a change to the
17  current week schedule?
18  A. We would see if anyone could cover
19  it. And then we would approach, either the
20  manager or Des that -- about what date we needed
21  to take off, and this person is filling in. And
22  then they would make a -- initial it on the
23  schedule. So that they know that it was
24  confirmed by Des.

### 36

1  Q. Did you ever fail to punch out?
2  A. Twice I had forgotten to punch out.
3  Q. Do you recall when those were?
4  A. No.
5  Q. How often did you work more than 40
6  hours in a week?
7  A. Maybe a couple of weeks in December
8  when it was a busy season for Christmas parties
9  in December.
10  Q. But generally you worked less than
11  40 hours?
12  A. A little less, maybe 30 -- between
13  30 and 40.
14  Q. Okay. So there were maybe two weeks
15  or so --
16  A. Two or three.
17  Q. -- that you worked more than 40?
18  A. More than 40.
19  Q. Do you -- I'm sorry. You said those
20  were in December?
21  A. In December, yes.
22  Q. Around Christmas-time?
23  A. Yes.
24  Q. Do you have any records of the hours

### 37

1  that you worked at the 40/40 Club?
2  A. No.
3  Q. Did you have the ability to print
4  out from POSitouch the hours that you had
5  worked?
6  A. Yes.
7  Q. But you never did so?
8  A. I never did --
9  Q. You never printed them out?
10  A. I printed them. I took it. But I
11  assumed that we would get something as far as a
12  check to show our hours.
13  Q. So what did you do with that
14  printout?
15  A. I keep it.
16  Q. So do you still have that?
17  A. No, I don't.
18  Q. When did you get rid of those?
19  A. Pretty much when I wasn't working at
20  40/40.
21  MS. SHEINKIN: Can we take a break?
22  MR. KIRSCHENBAUM: Sure.
23  MS. SHEINKIN: Just five minutes.

### 46

1  bartender. The rest were servers.
2      Q.  And tell me about your conversation
3  with Emanuel.
4      A.  Same thing. It was more just a lot
5  of questioning.
6      Q.  Well, it sounds like you're asking
7  questions concerning why you haven't received
8  money for this party. Were you also referring to
9  not receiving wages?
10     A.  That was already spoken about.
11 Because as I said, majority of the time they
12 would just tell us -- well, tell me, that no one
13 ever received a paycheck. It was kind of the
14 mystery question.
15     Q.  Did they specifically tell you that
16 they had not received wages for the hours they
17 had worked?
18     A.  No, they kind of just said, we never
19 get a paycheck.
20     Q.  Did anyone at the 40/40 Club ever
21 tell you they had not received wages for the
22 hours that they worked?
23         MR. KIRSCHENBAUM:  Objection.
24     That's a vague question.

### 47

1      Q.  Do you understand the question?
2      A.  They didn't specifically say -- they
3  didn't say -- I mean the only way to know if you
4  were getting paid is if you received a paycheck;
5  right? So if you don't know -- if you're not
6  receiving a paycheck, you don't know if you're
7  getting paid.
8      Q.  Well, do you know if they were
9  referring to wages for hours worked as opposed to
10 checks for parties?
11     A.  Hours for work. Checks for parties
12 were different. You worked an event, you get
13 tipped out, but you get a paycheck for that.
14 That's completely different. Hourly pay, that's
15 something, even if it's nothing on the check you
16 still need to receive something. At least that's
17 what I had gotten at other establishments that I
18 had worked at.
19     Q.  And at these other establishments
20 you'd end up with a zero balanced --
21     A.  Yes.
22     Q.  -- check? Is that also what you
23 would expect to receive at the 40/40 Club?
24     A.  Yes.

### 48

1      Q.  So you weren't expecting any wages
2  to be paid to you, you were just --
3         MR. KIRSCHENBAUM:  Objection.
4     That's not what she said.
5         MS. SHEINKIN:  I'm asking a
6     question.
7         MR. KIRSCHENBAUM:  Sure.
8      Q.  Is that correct, you weren't
9  expecting any actual wages to be paid?
10     A.  I was expecting something.
11     Q.  Just a stub that had that zeroed out
12 balance on it?
13     A.  It doesn't necessary have to be
14 zero. It only depends on how much you make
15 during the week. If taxes were taken out from
16 what the wages were supposed to be. It could be
17 a dollar. It would be 50 cents.
18     Q.  How much money in tips did you make
19 during the week?
20     A.  During the week.
21     Q.  Or in a given week?
22     A.  In a given week maybe -- including
23 the weekends, maybe 200, a little bit less.
24     Q.  $200 for a week in tips?

### 49

1      A.  There were days where I walked out
2  with nothing.
3      Q.  Why would that happen?
4      A.  Because there was no customers at
5  the bar.
6      Q.  So that's when you were at a not
7  service bar?
8      A.  That was when I was working at the
9  main bar during the week, no customers. But we
10 kind of still had to stay there anyway.
11     Q.  For how long would that -- did that
12 shift last?
13     A.  Till 2, 3 as I said earlier.
14     Q.  How many hours?
15     A.  Go in at 4, leave at 2.
16     Q.  And there were absolutely no
17 customers during that entire time period?
18     A.  There was customers, but my tips
19 were $5. There was maybe one customer, two max.
20     Q.  What about the tip outs from the
21 servers?
22     A.  It wouldn't be much, because they as
23 well weren't making money.
24     Q.  And then at the end of the night,

### 54

1   MR. KIRSCHENBAUM: That's your own
2   representation.
3        MR. MARKS: Well, the record states
4   what she started to say. Please let me
5   finish.
6        So it's obviously relevant to get
7   some evidence from her perspective of what
8   she was paid. I don't see how you could
9   argue that it's not relevant. She's made
10  representation to the government or
11  whatever it is. Maybe it's not
12  dispositive, but it's certainly relevant
13  to how much she believes that she was paid
14  or not paid.
15       MR. KIRSCHENBAUM: The case law is
16  abundant with statements that employee tax
17  returns are not relevant, are
18  presumptively inadmissible as evidence and
19  non-discoverable. And I'm ready to have
20  you try and make your point at some other
21  occasion, but right now I'm instructing my
22  client not to answer your question.
23       MR. MARKS: Okay. Well, you know
24  that if we have to do that, we'll come

### 55

1   back and you'll have to pay.
2        MR. KIRSCHENBAUM: That's fine.
3        MR. MARKS: You want to have that,
4   that's fine.
5        MR. KIRSCHENBAUM: I'll take the
6   consequences in stride.
7        MR. MARKS: Okay.
8
9   BY MS. SHEINKIN:
10  Q.   Are you refusing to answer that
11  question?
12       MR. KIRSCHENBAUM: Yes.
13  A.   Yes.
14  Q.   Did you receive a W2 from 40/40
15  Club?
16  A.   Yes, but it doesn't say much.
17  Q.   But you did receive it?
18  A.   It doesn't say much. It doesn't
19  look like a W2 form I would normally receive.
20  Q.   When did you receive it?
21  A.   January of this year.
22  Q.   So you received that in the mail
23  from the 40/40 Club?
24  A.   Yes.

### 56

1   MR. MARKS: January, like two weeks
2   ago?
3        THE WITNESS: Yes.
4   Q.   Are you referring to a W2 for 2007?
5   Work that you did in 2007 or work that you did in
6   2006? Are you referring to the document attached
7   as Exhibit C to your declaration?
8   A.   I'm sorry. Repeat that.
9   Q.   The document attached as Exhibit C
10  to your declaration?
11  A.   Yes.
12  Q.   Which you have in front of you?
13  A.   This one; right? That's C.
14  Q.   No, it's --
15  A.   It says C.
16  Q.   Marked as Exhibit Raz A. Exhibit C
17  to your declaration.
18       MR. KIRSCHENBAUM: Exhibit C to this
19  document. Is it all right if I turn the
20  pages for her?
21       MS. SHEINKIN: Yes. Sure.
22  A.   This is not what I received.
23  Q.   So you received a different W2?
24  A.   Yes.

### 57

1   Q.   When did you first receive this
2   document?
3   A.   What document?
4   Q.   Exhibit C to Raz A.
5   A.   This right here?
6   Q.   Yes.
7   A.   This is the first time I'm seeing it
8   right now, actually.
9   Q.   This is the first time you're seeing
10  it --
11  A.   Yes.
12  Q.   -- even though it's attached as an
13  exhibit to your declaration?
14  A.   I had only received up to here.
15  This is what I have.
16  Q.   I'm sorry?
17  A.   For me to see -- like what I looked
18  at and went over was this.
19  Q.   You've never seen the exhibits to
20  your declaration?
21  A.   No.
22  Q.   Let's look at them. For instance,
23  you have as Exhibit B a payroll report; do you
24  see that document?

## 58

1  A. Uh-huh.
2  Q. Do you have any reason to believe
3  that this is not an accurate reflection of the
4  hours that you worked at the 40/40 club?
5  A. I wouldn't know. I didn't receive
6  anything.
7  Q. Are you looking at the right
8  document, Exhibit B?
9  A. This one right here?
10 Q. Yeah. My question was: Do you have
11 any reason to believe that the report is not an
12 accurate reflection of your working hours at the
13 40/40 Club?
14 A. I wouldn't know though, because I
15 didn't receive a paycheck.
16 Q. My question was if you had a reason
17 to believe that it's not accurate.
18 A. Where are the dates?
19     MR. MARKS: On the left.
20 A. So the first line is January 14th,
21 second is January 21st?
22 Q. Right.
23 A. Why would it go up to February?
24     MR. MARKS: Cause you worked till

## 59

1  then?
2     THE WITNESS: No.
3     MR. MARKS: No?
4     THE WITNESS: I only worked from
5  November 2006 to January of '07.
6  Q. Other than the fact that it has
7  dates in February, and you said that you stopped
8  working in January, is there any reason that you
9  have to doubt that these reports are an accurate
10 reflection of your hours worked?
11 A. I mean if this is -- is this
12 everything? I mean where did December go?
13 Q. This is for 2007?
14 A. So then you would just count for the
15 first three dates. So are you telling me that
16 for February, and what is that six, that's June.
17 I'm getting taxed for that?
18 Q. I'm not telling you anything. I'm
19 asking you if you have any reason to believe that
20 this is not an accurate reflection of your
21 working hours at the 40/40 Club?
22 A. It's not.
23 Q. Okay. What --
24 A. I mean I'm trying to understand --

## 60

1  Q. Because it includes dates in
2  February, is that why it's not accurate?
3  A. Yes.
4     MR. KIRSCHENBAUM: Do you mind if I
5  just point to my client where the hours
6  are recorded in this document?
7     MS. SHEINKIN: Go ahead.
8     THE WITNESS: Right. I understand
9  that.
10 Q. Have you seen this document before?
11 A. No.
12 Q. You've never seen this document?
13 A. No.
14 Q. In your declaration, you say that
15 this document was shown to you by your lawyers;
16 is that a false statement?
17 A. I seen the -- this one.
18 Q. You've seen Exhibit A?
19 A. Yes.
20 Q. But it's a false statement that you
21 have previously seen the documents attached as
22 Exhibit B and Exhibit C?
23 A. C, I have not. C, I didn't see.
24 Q. Your lawyers never showed you that

## 61

1  document?
2  A. These --
3     MR. KIRSCHENBAUM: Objection. First
4  of all, it's attorney/client privilege.
5     MR. MARKS: We'll invoke the fraud
6  exception, because the declaration says
7  she was shown it by her attorney. So
8  we're allowed to explore that.
9     MR. KIRSCHENBAUM: My communication
10 to her is not an inference of any fraud.
11    MR. MARKS: Well, I don't know. She
12 swore to something that's apparently not
13 true.
14 A. These I've seen. This I have not
15 seen.
16 Q. You have not seen Exhibit C?
17 A. No.
18 Q. But now, you have seen Exhibit B?
19 A. No, C, I have now seen. B and A, I
20 have seen.
21 Q. When did you see Exhibit B?
22 A. When did I see B, when I met with
23 him earlier.
24 Q. Today?

THERESE RAZ

66

1 it should have been. Because it was busy. I
2 just didn't know -- I wasn't being careful at
3 that time.
4     Q.  Okay. What happened?
5     A.  I had multiple credit card slips,
6 and then I was kind of just going.
7     Q.  How did that issue come to light?
8     A.  At the end of the night.
9     Q.  Okay. What happened?
10    A.  Des approached me about it, asked me
11 what happened. I don't know how it happened. I
12 messed up. I took the wrong imprint by accident.
13 And that was my story.
14    Q.  And at that time you didn't receive
15 the tip for that check?
16    A.  No.
17    Q.  And what happened after 90 days,
18 then you did receive it?
19    A.  No, I had left already by that time.
20    Q.  So you never went back to ask for
21 it?
22    A.  No.
23    Q.  Do you have any knowledge of any
24 other employee having a tip retained because of a

67

1 dispute with a credit card?
2     A.  Yes, but I do not know the name. I
3 remember hearing that.
4     Q.  But you don't have any specific
5 knowledge of any specific incident where that
6 occurred?
7     A.  No.
8     Q.  Did you ever have any money taken
9 from you for spills or breakage?
10    A.  Breakage.
11    Q.  That did occur?
12    A.  Yes.
13    Q.  On how many occasions?
14    A.  One.
15    Q.  What were the circumstances?
16    A.  A bottle broke.
17    Q.  A bottle of alcohol?
18    A.  Yes.
19    Q.  And what happened?
20    A.  It was me and another bartender I
21 was working with at that time. A bottle broke,
22 and we had to pay for it.
23    Q.  You and the other bartender?
24    A.  Yes.

68

1     Q.  Who was the other bartender?
2     A.  Jenny.
3     Q.  Jenny?
4     A.  Jenny.
5     Q.  How did the bottle break?
6     A.  The -- it's on glass, and because of
7 the music being so loud the bass pushes it
8 forward.
9     Q.  So neither of you were touching the
10 bottle when it broke?
11    A.  No, we have to kind of monitor it
12 and keep pushing it back. But at that time it
13 was busy, and we just kind of didn't.
14    Q.  How much was the bottle?
15    A.  I think we had to pay 40 each,
16 something like that.
17    Q.  Do you recall what it was?
18    A.  Bombay Sapphire.
19    Q.  Who did you pay the money to?
20    A.  I gave it to Jenny, and I believe
21 Jenny gave it to Des or whatever manager.
22    Q.  Did somebody tell you that you had
23 to pay that money?
24    A.  We had to say -- we had to say what

69

1 happened, because at the end of the night in
2 order for us to get a full bottle we have return
3 an empty bottle. So we had to tell the manager
4 that a bottle broke.
5     Q.  What manager?
6     A.  I think his name was Michael.
7     Q.  Michael?
8     A.  Michael.
9     Q.  Do you recall his last name?
10    A.  No.
11    Q.  Do you recall when this occurred?
12    A.  No.
13    Q.  And you gave $40 to Jenny?
14    A.  Jenny said, do you have the money
15 for the bottle, and I'll give it to the manager
16 or Des.
17    Q.  Did you witness her give it to the
18 manager?
19    A.  No.
20    Q.  So you don't know one way or the
21 other whether or not she gave that money to
22 anyone at the 40/40 Club?
23    A.  I didn't witness it.
24    Q.  Other than Jenny, did you witness

18 (Pages 66 to 69)

THERESE RAZ

70

1  any other employee having to pay for breakage or
2  spills?
3      A.  No, not that I saw or witnessed.
4      Q.  Have you ever seen or been involved
5  in any other breakage?
6      A.  No, only that one incident.
7      Q.  Have you ever spilled a drink?
8      A.  I mean there was a mistake.
9      Q.  What sort of mistake?
10     A.  Like if I heard a drink wrong, and I
11 made a different drink.
12     Q.  Okay.  What did you do in those
13 circumstances?
14     A.  I would save it to see if I could
15 use it again for another drink, and that's pretty
16 much it.
17     Q.  But you didn't have to pay for that?
18     A.  No.
19     Q.  Have you talked to any current or
20 former employees of the 40/40 Club concerning
21 your claims in this matter?
22     A.  No.
23     Q.  Have you communicated with any
24 current or former employees since you've left the

71

1  40/40 Club?
2      A.  Yes.
3      Q.  Who?
4      A.  Amber, Lauren, Shaquana, Kim,
5  Kimberly.
6      Q.  Is Kim the same as Kimberly?
7      A.  Yeah, there's a Kim.
8      Q.  Oh, two different people?
9      A.  Yeah, and then there's Kimberly.
10     Q.  Is that on a social level?
11     A.  Yes.
12     Q.  Have you asked any of these
13 individuals whether or not they want to join in
14 this lawsuit?
15     A.  No.
16     Q.  Have you communicated with them at
17 all concerning this lawsuit?
18     A.  No.
19     Q.  How did you become involved in this
20 lawsuit?
21     A.  Christine -- Christy told me about
22 it.
23     Q.  Christine Borbely?
24     A.  Yes.

72

1      Q.  What did she say?
2      A.  Well, I overheard the news, and then
3  -- about what was going on.
4      Q.  You heard about the case in the
5  news?
6      A.  Yes, then she asked -- she had
7  texted me about what she was getting involved in.
8      Q.  She texted you?
9      A.  Yeah.
10     Q.  What did she say?
11     A.  That she was speaking to someone
12 that was involved in the case.  And if I wanted
13 to be involved to call that person.
14     Q.  Was that person an attorney?
15     A.  Yes.
16     Q.  Did she give you any other
17 information about the case?
18     A.  No.
19     Q.  Have you ever seen Shawn Carter in
20 the club?
21     A.  Yes.
22     Q.  On how many occasions?
23     A.  Maybe five times.
24     Q.  Was he there as a guest?

73

1      A.  He would just come in whenever, I
2  guess, he was in New York.
3      Q.  Just to visit the club?
4      A.  (Witness nods head.)
5      Q.  Did he have an office in the club?
6      A.  Not that I know of.
7      Q.  Did you ever have any communication
8  with him?
9      A.  No.
10     Q.  Did he ever give you any direction?
11     A.  No.
12     Q.  Have you seen Juan Perez in the
13 club?
14     A.  Yes.
15     Q.  On how many occasions?
16     A.  A lot.  He was there majority of the
17 time.
18     Q.  Did you ever communicate with him?
19     A.  At the end of the night, as far as
20 just seeing if our banks were okay.  He would
21 count money.  And we would go to him to see if
22 everything was okay with our drawer.  If we
23 needed to owe money.  If our drawer was short.
24     Q.  Was that the only communication you

19 (Pages 70 to 73)

74

1  had with him?
2    A. Yes.
3    Q. Did he ever give you any direction?
4    A. No.
5    Q. Do you know if either Shawn Carter
6  or Juan Perez had ever hired any employees of the
7  40/40 Club?
8    A. Not that I know of.
9    Q. Do you know any employees that
10 either of them ever terminated?
11   A. No.
12   Q. Do you have knowledge concerning how
13 other employees, other than servers and
14 bartenders, were compensated?
15   A. As far as tips from customers?
16   Q. As far as how they're paid by 40/40
17 Club?
18   A. Not to my knowledge.
19   Q. Did any position receive tips from
20 customers other than servers and bartender?
21   A. No.
22   Q. And do you know how -- you've tipped
23 out, you said, to barbacks?
24   A. Barbacks.

75

1    Q. Do you know how the barbacks were
2  compensated by the 40/40 Club?
3    A. No.
4       MS. SHEINKIN: Can we take another
5  break?
6       MR. KIRSCHENBAUM: Sure.
7
8       (A recess was taken.)
9
10      (Raz Exhibit E, SALES
11      JOURNAL REPORT, was marked
12      for identification.)
13
14      (Raz Exhibit F, TIME RECORDS,
15      were marked for identification.)
16
17      (Raz Exhibit G, TRANSACTION REPORT,
18      was marked for identification.)
19
20 BY MS. SHEINKIN:
21   Q. Ms. Raz, when you closed each night,
22 you would have a report of how much you had made
23 in sales that day?
24   A. Yes, I would assume so. I never saw

76

1  my sales.
2    Q. You never saw your sales?
3    A. (Witness shakes head.)
4    Q. How did you then know what the ten
5  percent of your sales was that you were declaring
6  as --
7    A. I'm sorry, yes. When you had to
8  punch out you could see a percentage -- you could
9  see your sales. But I didn't see the actual
10 printout.
11   Q. You could see your sales for the
12 day?
13   A. Yes.
14   Q. How did you tip out the barbacks if
15 you hadn't yet seen your sales numbers?
16   A. Actually -- I'm sorry. You know
17 why, cause I've worked at so many places. It's
18 kind of all together. We would see food sales,
19 and that would be tipped out somehow. Honestly,
20 I forgot how it worked. You would have to look
21 at the food sales.
22   Q. Because you also tipped out food
23 runners?
24   A. Food runners.

77

1    Q. How did you tip them out?
2    A. I believe a percentage of the sales.
3    Q. Of total sales, food and drink?
4    A. Total sales of food only.
5    Q. Are you saying there's two separate
6  reports between food and drink?
7    A. Yes, there's two different lines.
8  There was like -- there was a food sale, I know
9  that.
10   Q. And drink sale. And that was on one
11 single report?
12   A. Well, the total -- I believe the
13 total that we get to see is everything with the
14 food and the drinks.
15   Q. Okay. And that is something that
16 you would see each night when you closed out?
17   A. Yes.
18   Q. And would it also distinguish
19 between cash sales and credit card sales?
20   A. Yes.
21   Q. Okay. And can you please look at
22 what I've marked as Exhibit Raz E.
23   A. Yes.
24   Q. It should be right in front of you.