# EXHIBIT Y

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X

CELESTE WILLIAMS, LAUREN CRUZ,

EMANUEL O'NEALE, BRANDON STURMAN,

LATRESHA HALL, LAKEISHA MITCHELL,

CHRISTINE BORBELY and JANINE APONTE

on behalf of themselves and others

similarly situated,

   Plaintiffs,

 -against-     Index No.

           07cv3978

TWENTY ONES, INC., d/b/a THE 40/40

CLUB, SHAWN CARTER p/k/a JAY-Z,

JUAN PEREZ and DESIREE GONZALES,

   Defendants.

- - - - - - - - - - - - - - - - - - - -X

   January 22, 2008

   9:39 a.m.

DEPOSITION of BRANDON STURMAN, a Plaintiff

herein, taken pursuant to Notice, and held

at the offices of Littler Mendelson, P.C.,

885 Third Avenue, New York, New York, before

Leeann Bertorelli, a Court Reporter and

Notary Public of the State of New York.

DALCO Reporting, Inc.
court reporting • legal video • videoconferencing
170 Hamilton Avenue, White Plains, NY 10601
914.684.9009  Fax 914.684.6561  212.679.6095
800 DAL 8779  dalcoreporting.com

### 26

```
 1        was held.)
 2
 3   BY MR. MARKS:
 4        Q.   It was in '06?
 5        A.   Yes.
 6        Q.   Okay. So I have to ask you these
 7   questions. Why did you claim that you worked at
 8   40/40 Club in 2007?
 9        A.   I'm sorry?
10        Q.   Why do you say you worked at the
11   40/40 Club in 2007?
12        A.   I worked for the 40/40. I told you,
13   it's an approximation of when I worked.
14        Q.   I know. But you just agreed with me
15   that we're talking about '06 when you left and
16   were fired abruptly, and now --
17        A.   I said to you from the moment that
18   we walked in here, that I don't know the exact
19   timeline of when I worked. Never did I state an
20   exact month or time period that I ever worked. I
21   don't know the exact time period. If you want me
22   to go back to pay stubs and paychecks, and see
23   exactly when I worked in my documents, my
24   personal stuff, I can give you an exact timeline.
```

### 27

```
 1   If that's what you want from me. I wasn't aware
 2   of that. I would have came and had the exact
 3   dates that I know I was fired per se, or when I
 4   was hired. I can go back on my computer and
 5   check all of that. I don't have all of that.
 6        Q.   You can?
 7        A.   Why would I not be able to?
 8        Q.   I don't know. I would think you
 9   can.
10        A.   I would think I can too.
11        Q.   Right. And you must preserve those
12   records now, because we need those.
13        A.   I don't throw any records out. I
14   have everything that I have.
15        Q.   Did you work at the 40/40 Club in
16   2007?
17        A.   I have -- hold on a second. I might
18   have. I might have.
19        Q.   But if Vivica Fox's party was in
20   Atlantic City --
21        A.   It may have been 2006 then, because
22   I worked in -- my daughter turned one in
23   November, and I started working on Wall Street
24   around September -- I can't give you the exact
```

### 28

```
 1   date and the months. I can't.
 2        Q.   I'm not asking for the exact date.
 3   I'm asking the year.
 4        A.   You're asking from December and
 5   January, it's a difference of months. So if
 6   you're going to hold me to 2006 or 2007, it was
 7   around that timeline. The timeline was right
 8   around there. I don't know the exact date.
 9   There was a lot going on. You want me to
10   remember a while ago, the exact month, I'm not
11   going to give it to you.
12        Q.   I'm asking for a year now.
13        A.   No, you're asking for a month.
14        Q.   I'm not. I'm asking if you worked
15   in the 40/40 Club in 2007. You say you can't
16   recall, but you know you didn't work there after
17   you were fired abruptly, you know you were fired
18   the weekend before Vivica Fox's party in Atlantic
19   City. All of that is true; correct?
20        A.   Yes.
21        Q.   And you know your daughter was one?
22        A.   Well, that you're not going to get
23   me on. I can tell you that.
24        Q.   Okay. And you know that you think
```

### 29

```
 1   you worked at -- in the mortgage business for a
 2   year-and-a-half or two years?
 3        A.   Less than that. Less than two
 4   years, probably like a year-and-a-half.
 5        Q.   Which would, again, put us back to
 6   June, July of '06?
 7        A.   I was still working. I was still
 8   telemarketing when I was working in the 40/40.
 9        Q.   Well, I think you better correct the
10   record, because if you read it back, it would
11   show that you said that you started working in
12   that industry right after you were abruptly fired
13   -- so now you're going to say --
14        A.   I started being a loan officer after
15   I got fired.
16        Q.   Okay.
17        A.   I was telemarketing before that.
18        Q.   Okay. So --
19        A.   I was telemarketing before that.
20        Q.   We both can't talk at the same time.
21   So you go ahead.
22        A.   Okay. You can't manipulate me on
23   what's the truth. So you can try to get me on
24   the timelines, but believe me I can prove and say
```



BRANDON STURMAN

**Page 74**

1  Depending -- I could have been on the schedule
2  for an outside bar, and then when I go there I
3  let the girl work out, and I'll work the service
4  bar. It didn't matter really where you were. It
5  was not a big deal. I could say, Desiree, listen
6  I'm going to work the service bar. She's going
7  to work out there. It was no big deal at that
8  point.
9      Q. Okay. Did you record anywhere where
10 you were working, like what bar you were at?
11     A. No.
12     Q. Now, let's talk about not working
13 the service bar, the other bar.
14     A. Okay.
15     Q. You'd have to use the cash register
16 then; yes?
17     A. Uh-huh.
18     Q. And what's that process work -- how
19 does that work?
20     A. You punch in the drink, and you take
21 the money, and you put the money in the register
22 for cash transactions.
23     Q. And so there's cash and credit
24 transactions?

**Page 75**

1      A. Yes.
2      Q. Predominately?
3      A. Yes.
4      Q. I suppose there's some gift
5  certificates, but predominately cash and credit;
6  yes?
7      A. I would say all cash and credit.
8      Q. Okay. Fine. When you get cash,
9  what is the procedure?
10     A. Take the cash, put the money in the
11 register.
12     Q. And when do you take the cash?
13     A. Either when you serve the drink or
14 if they're running a tab.
15     Q. Were you allowed to run a cash tab?
16     A. No.
17     Q. So all bar drinks were cash and
18 carry?
19     A. Yes.
20     Q. And people would tip you right then
21 and there?
22     A. No, we used to charge them a tip
23 without telling them.
24     Q. Okay. In addition to charging them

**Page 76**

1  a tip without telling them, did they also give a
2  cash tip?
3      A. Sometimes. Not really, but
4  sometimes.
5      Q. And you would expect that those
6  people did or did not know that they were being
7  charged?
8      A. Definitely didn't know.
9      Q. So let's give a sort of typical
10 situation. Okay. I'm coming to bar, and I say,
11 let's me have two Heinekens; right?
12     A. Uh-huh.
13     Q. Then you charge me for them; right?
14     A. I rather you use an example of three
15 drinks. Because it's a $30 minimum. So it's --
16     Q. Each time?
17     A. No, it's a $30 minimum for us to
18 charge gratuity.
19     Q. Okay.
20     A. So we try to batch the drinks. So
21 if somebody ordered, for instance, I can give you
22 an example.
23     Q. Oh, sure. Go ahead.
24     A. If somebody ordered three Grey Goose

**Page 77**

1  and cranberry, it would 11/11/11, 33. We would
2  charge them $6.60 gratuity in our minds. So
3  instead of telling somebody 33, we say 39. The
4  person gives us 40, we take a dollar out for the
5  gratuity, put six on the side, give them --
6  obviously the money into the register. We could
7  give them the dollar back, and leave the $6 on
8  the side.
9          So they think it's $39. It's a busy
10 club. They don't really see it. We end up
11 getting the $6 gratuity. And then if they leave
12 the dollar, we end up getting a $7 gratuity.
13         We're not telling the client it's a
14 33, plus a $6 gratuity, we just say 39. So if
15 the bill comes out and somebody orders multiple
16 drinks, and the tab per se is $50. We don't say
17 50, we just say 60, because we're allowed to
18 charge a $20 gratuity, because the clientele in
19 that club just doesn't tip.
20     Q. Okay. They don't tip.
21     A. It's not a high tipping compared to
22 other places that you work at.
23     Q. So you billed it in?
24     A. She did that for the bartenders, I



## 78

1  assume, so we could all make money.
2      Q.  I understand that. And we're on
3  three Grey Gooses -- what did you say, with what?
4      A.  Cranberry.
5      Q.  What do you ring up on the register?
6      A.  Three Grey Goose and cranberry.
7      Q.  And it comes out to be 33?
8      A.  I'm pretty sure --
9      Q.  That's fine.
10     A.  -- it was 33.
11     Q.  And do you -- you would actually
12 charge the client 39?
13     A.  Yes.
14     Q.  So that $6 was a tip to you?
15     A.  Was a tip, yes.
16     Q.  At the end of the night, what do you
17 have to do?
18     A.  Split your tips.
19     Q.  Are they kept in a common --
20     A.  No --
21     Q.  Withdrawn.
22         Did you have your own register, each
23 bartender have their own register?
24     A.  We shared a single register, double

## 79

1  drawer.
2      Q.  So you had your own drawer?
3      A.  Yeah, yeah, yeah.
4      Q.  On a register?
5      A.  Of course.
6      Q.  Okay. So if you made a mistake or
7  something, was that ever checked?
8      A.  Mistakes on the drawer?
9      Q.  Yeah.
10     A.  Of course.
11     Q.  All right. So at the end of the
12 night, let's talk about the money you have to
13 turn into the club. How did that work?
14     A.  Come grab your drawer, take it in,
15 and count it.
16     Q.  Who does that?
17     A.  A manager.
18     Q.  Do you count your drawer out first?
19     A.  I don't think so, no. I think if
20 you count it, you could fix the drawer, so they
21 don't let you see your things.
22         Other places, where you might work,
23 you could print out, you know, an X report or a Z
24 report to see what you rang, to make sure that

## 80

1  you're not doing that. She's a savvy-business
2  person. She knows that you could rob a bar. So
3  what she does is, she doesn't allow you to see
4  it, to make sure that your drawer is done
5  correctly.
6      Q.  Okay.
7      A.  So you don't see that. They just
8  take your drawer, count it. If it's off, she
9  knows you're stealing. And if it's on, she knows
10 that you're a good bartender.
11     Q.  All right. Were you ever --
12     A.  An honest bartender.
13     Q.  Were you ever short or over?
14     A.  Never where it was a problem.
15     Q.  What time did the bar close?
16     A.  4.
17     Q.  4:00. And what time would they
18 count your drawer?
19     A.  We used to get out of there about 6,
20 6:30. That's because we were waiting for the
21 waitresses to count their drawers, so we can get
22 the tips.
23     Q.  And what about when you were service
24 bartender?

## 81

1      A.  It's the same thing, because the
2  service bar upstairs splits with the upstairs
3  bar. Downstairs has to wait from the tip out
4  from the main bar. The only bar that you get out
5  quickly is if you work the club bar. If you're
6  lucky that they open it, and then you get to
7  work.
8      Q.  So last call is what time?
9      A.  3:55 she shuts it down.
10     Q.  So you can't serve after 4, that's
11 state law?
12     A.  Yeah, she doesn't do that.
13     Q.  And what time did they come and take
14 your drawer?
15     A.  Depending on how packed it was. If
16 it's a Friday and Saturday night, last moment.
17     Q.  What like 4 -- I mean 3:55?
18     A.  They would always leave one drawer
19 open. She closed on time. She was always on
20 time with that. So the last drawer, she had one
21 drawer, and then she would always close at the
22 last second.
23     Q.  And then the barbacks would clean
24 up?



21 (Pages 78 to 81)

82

1  A. No, we would clean up.
2  Q. All right. Not in the service bar,
3  you said the barbacks --
4  A. No, no. We would clean up. I would
5  have an assistant. I said like with the dirty
6  work, quote-unquote, on a bartender term. I
7  would clean off the bottles and put the bottles
8  away. But like garbage and stuff like that you
9  send the barback to do it.
10  Q. Okay. And how long would that take
11  to clean up?
12  A. 20 minutes, depending on which bar.
13  The main bar is a little bit longer.
14  Q. And then -- but then you waited
15  around to get your money?
16  A. Yes.
17  Q. Okay. If you didn't wait around,
18  you could get the money the next day?
19  A. Yeah, if wanted to trust everybody
20  to get your money. But that was not -- we
21  weren't going to wait around and get your money
22  from the club. You would wait around and get
23  your money from a particular person that you
24  might trust.

83

1  But nobody did that in that club
2  because -- for the simple fact like if I have to
3  wait, you have to wait. So unless it was like,
4  you know, everybody pretty much just hung around.
5  Rarely did somebody leave early without their
6  nightly money.
7  Q. Were there any break times when you
8  were --
9  A. When?
10  Q. When you were a waiter -- I mean,
11  sorry. When you were a bartender -- I don't
12  know. At any time, did you get a break, if you
13  had to go to bathroom or something? Is there any
14  scheduled break?
15  A. No. During the course of a club
16  night?
17  Q. Yeah, any scheduled breaks?
18  A. No, you can't do that in the course
19  of a club. I know you're a lawyer, but in the
20  course of a club, it's a busy club. This is a
21  big club.
22  Q. What if you have to pee?
23  A. What?
24  Q. What if you have to pee?

84

1  A. Well, then you better run and pee,
2  and you better get back right away.
3  Q. Well, does someone watch your bar
4  while you were peeing?
5  A. There's multiple bars, not a single
6  person bar. These are multiple bars. If you had
7  to run and pee, she's not a dictator. She'll let
8  you pee, if you got to run and pee.
9  Q. Now, when you started a shift, did
10  you record your time any time?
11  A. When I worked the actual bar?
12  Q. Uh-huh.
13  A. Yeah, you have to punch in to start
14  working.
15  Q. Okay. What do you punch into?
16  A. For a register, if you're working a
17  registered part. If it's a regular night where
18  you're not -- if you're working service bar, you
19  don't have to punch in. Because this is how it
20  works, you don't need to punch in because you're
21  not getting paid. So when you work those hours
22  when you work -- sometimes when you have a
23  drawer, then you would have to punch in. If it's
24  a slow night, maybe two people would split a

85

1  drawer. So you don't punch in. But it made no
2  difference, because they don't track your hours
3  and give you a paycheck anyway.
4  So for the first couple of weeks, I
5  probably punched in every single time. After
6  that, probably only when I had to.
7  Q. And what about punching out?
8  A. No, only when you had a -- a drawer.
9  I wouldn't -- if you don't punch in, you don't
10  punch out.
11  Q. Okay. What was the latest time of
12  day you worked?
13  A. What do you mean --
14  Q. Well --
15  A. -- to start working?
16  Q. Yeah.
17  A. To start my shift or to end my
18  shift?
19  Q. Both.
20  A. Well, the club closes at 4. So you
21  actually stopped working after 4 serving drinks.
22  But you can stay there to work till as late as 7
23  in the morning I've been there. Starting shifts,
24  I think the club bar, we used to start at 10:00.

22 (Pages 82 to 85)



BRANDON STURMAN

102

1  Q. You cannot?
2  A. I don't want to sit here and name
3  names of people. It's a broad thing. You name
4  people that I've worked with, there were many,
5  many, many people that I've worked with. And
6  everybody experienced the same exact thing there.
7  Q. My question to you is: Can you name
8  anyone that you discussed the fact that you
9  didn't get a pay stub with?
10 A. No.
11 Q. Do you know of your own knowledge
12 the work hours of any other employee of the 40/40
13 Club?
14 A. Did I know how many hours they
15 worked?
16 Q. Uh-huh.
17 A. Definitely.
18 Q. Okay. Who do you know how many
19 hours they worked?
20 A. Every single bartender that worked
21 there.
22 Q. And how do you know what their hours
23 were?
24 A. I worked with them.

103

1  Q. And what hours were they?
2  A. Per week?
3  Q. Yes.
4  A. Per day?
5  Q. Well, you know so, you could start
6  off by naming any other bartender, and the hours
7  they worked.
8  A. How do I know specifically a
9  person's name, and the week and the hour that
10 they're working?
11 Q. I don't know. But when you said
12 that you did, I was surprised. That's why I'm
13 asking you to say what it is.
14 A. You misrepresented the question.
15 That's why I answered it like that.
16 Q. I don't think I misrepresented the
17 question. But a question is a question. I don't
18 know how there could be a misrepresentation in
19 it.
20    Okay. So you don't know the hours
21 of any other person at the 40/40 Club?
22    MR. KIRSCHENBAUM: Objection.
23 A. The hours like what? What would you
24 mean by that?

104

1  Q. The number of hours that they worked
2  per week.
3  A. How would I have their specific
4  hours per work week?
5  Q. I don't know. But then the answer
6  to my question is no, I don't know.
7  A. No, I don't know.
8  Q. Did you ever discuss with any other
9  employee at the 40/40 Club the number of hours
10 they were working?
11 A. Definitely.
12 Q. Okay. Whom?
13 A. Everybody that worked there.
14 Q. Give me a name. And --
15 A. I can't give you a specific name.
16 Every single person that worked there. Everybody
17 sat there and talked. At the end of every night,
18 every single worker, waiter, and bartender sat in
19 a room, and every single person talked. It's not
20 a one on one conversation that I'm going with any
21 specific person. It's a multitude of people.
22 This is not one specific person.
23 Q. Okay. So you're saying that you
24 can't identify any specific person?

105

1  A. Why would I identify a specific
2  person? I won't identify a specific person.
3  It's a broad number. There's every single that
4  worked there. It's not like some people thought
5  that Desiree was doing the right thing, and some
6  people -- everybody knew what she was doing.
7     This was an obvious, common thing.
8  So there was no specific conversation that you
9  want me to recollect and say, okay, I spoke to
10 person A at this time and they told me in
11 November 1st, I worked 44 hours a week. No,
12 there's no such thing as that. I don't have
13 that. I can't prove that. I can't say that.
14 There's nothing to, you know.
15 Q. Okay. Did you ever forget to punch
16 out of work at the end of the day?
17 A. Definitely.
18 Q. Did you get a W2 form?
19 A. Never.
20 Q. Did you pay taxes in '06?
21 A. Yes.
22 Q. And did you indicate how much taxes
23 had been withheld from your income in '06?
24    MR. KIRSCHENBAUM: Objection. I'm

27 (Pages 102 to 105)



**138**

1   A.   It's the same club. It's the same
2  procedures in both clubs. I was sent there from
3  New York to Atlantic City.
4       Q.   Okay. If you can remember any time
5  when this happened to you in New York --
6       A.   No, I don't know.
7       Q.   -- please let me know.
8
9  DOCUMENT/INFORMATION REQUESTED:
10
11      Q.   Did you ever talk to anybody else
12 about their having to pay when a customer walked
13 out?
14      A.   Of course.
15      Q.   Okay. Who did you talk to?
16      A.   No one specific again.
17      Q.   You have no specific recollection of
18 any particular conversation you had with anyone
19 about this policy?
20      A.   No.
21      Q.   Did you ever pay for breakages or
22 spills?
23      A.   No, not that I remember.
24      Q.   Did you ever talk to anybody else

**139**

1  about breakages or spills?
2       A.   Yeah, people used to pay.
3       Q.   Who?
4       A.   Other bartenders, other waitresses.
5       Q.   Do you have any recollection of any
6  specific person telling you that they were
7  charged for breakage or spill?
8       A.   Nothing specific.
9       Q.   Do you recall what the credit card
10 procedure was at 40/40 Club?
11      A.   Uh-huh.
12      Q.   What is it?
13      A.   To get an imprint, preauthorize the
14 card.
15      Q.   Anything else?
16      A.   That's it. Get signatures on the
17 authorization, and signatures on the credit card
18 bill.
19      Q.   Was there a six step procedure that
20 you're aware of?
21      A.   If I broke it down, I'd probably get
22 every procedure.
23      Q.   Okay. Please do so.
24      A.   You take the credit card with the

**140**

1  license, verify that the names are together,
2  imprint the credit card, preauthorize the credit
3  card. I think we used to staple them. I don't
4  even know, but keep them both together. And then
5  you get a signature of over a hundred dollars on
6  the imprint, as well as -- there would be a
7  double signature. I think it was over a hundred
8  dollars. That's why I never had any large bills
9  that I had to pay.
10      Q.   I'm sorry. So if the bill was over
11 a hundred dollars --
12      A.   No, you'd get a double signature.
13      Q.   What's a double signature?
14      A.   A signature on the imprint, and a
15 signature on the actual credit card bill.
16      Q.   So if you served someone, and their
17 drinks were over a hundred dollars, you would --
18      A.   You would get a double signature.
19      Q.   Could you run a tab that was in
20 excess of a hundred dollars before getting a
21 signature?
22      A.   Of course. But you would have to
23 re-preauthorize the credit card. If you have a
24 tab -- let me just explain myself.

**141**

1            If you have a tab, and you
2  preauthorize it for $100 or say $200, and that
3  tab is going in excess of the $200, then you
4  should re-preauthorize the credit card. And make
5  sure the credit card could handle a three, $400
6  tab per se. That way you make sure that, yes,
7  they were authorized for 200, but if the bill is
8  300 it's not going to get turned down now,
9  because it's over the $200 that you originally
10 had preauthorized it for.
11      Q.   Okay. Have you -- since this
12 lawsuit started, spoken to any other server or
13 bartender at -- or any other former employee of
14 the 40/40 Club?
15      A.   Nope. Not that I -- no, I don't
16 speak to anybody.
17      Q.   On an occasion where you didn't get
18 a credit card imprint, did you receive a warning
19 from the 40/40 Club?
20      A.   Yeah, you always received a warning.
21 That way you didn't get fired. She didn't fire
22 you right off the bat.
23      Q.   Okay.
24           MR. MARKS: Let me mark this as the



**142**

1  next exhibit in this deposition.
2
3  (Sturman Exhibit E,
4  NOTICE OF DISCIPLINARY
5  ACTION, was marked for
6  identification.)
7
8  Q. Is that your signature on there?
9  A. Yeah.
10 Q. Do you recall getting that warning?
11 A. I assume this was probably right
12 after I started working, based on the date that
13 you showed me.
14 Q. Did you recall getting that warning?
15 A. Yes.
16 Q. And do you know who gave it you?
17 A. No.
18 Q. Do you know whose signature that is
19 as the manager?
20 A. No, I assume it's Desiree, because
21 it's a D.
22 Q. At the time you got this warning,
23 did you have to pay the credit card bill?
24 A. I couldn't tell you.

**143**

1  Q. Okay. There would be meetings with
2  the staff on Mondays?
3  A. Yes.
4  Q. And what subject matters were
5  covered in those meetings?
6  A. Whatever was going on in the club.
7  Q. Did they discuss policies and
8  procedures?
9  A. Definitely.
10 Q. Did employees raise questions during
11 those meetings?
12 A. Not really like -- yeah, we raised
13 certain questions.
14 Q. Did -- was there ever questions
15 raised about not -- allegedly not getting pay
16 stubs?
17 A. Once.
18 Q. Do you remember who raised that
19 question?
20 A. Me.
21 Q. And what was the response?
22 A. I better shut my mouth, because I
23 know I'm going to lose my job.
24 Q. And who responded that?

**144**

1  A. Everybody knew that.
2  Q. I'm sorry. Who responded that to
3  you?
4  A. The conversation got twisted and
5  changed. And then when we walked out of the
6  conversation, everybody was like, if you want
7  your job -- I remember I just had started working
8  there maybe a couple of weeks into working. And
9  I was told, you know what, you better watch how
10 you talk to her, because if you talk to her that
11 way she's going to fire you.
12     So I was caught into a situation
13 where I couldn't say anything to her, because I
14 had to make sure. So we were friendly. I
15 wouldn't say more friendly, but we were friendly.
16 We were always --
17 Q. Who's "we"?
18 A. Me and Desiree. I never had a --
19 besides any of that, she was always good to me.
20 It wasn't a bad thing. But as far as getting
21 that, you knew there were certain things you
22 couldn't approach her about, period.
23 Q. So your co-workers said don't raise
24 that because you'd be fired?

**145**

1  A. Everybody knew that.
2  Q. I'm sorry. Did your co-workers tell
3  you?
4  A. Yeah, and they were right. Because
5  the moment I said something I got fired that
6  night.
7  Q. Now, you didn't get fired for asking
8  that question at the meeting?
9  A. I got fired -- no.
10 Q. Was the entire staff present at
11 those meetings?
12 A. Service and bartenders.
13 Q. Not back of the house people?
14 A. No.
15 Q. And what managers were there?
16 A. Every day different. Usually one
17 manager hosted the meeting.
18 Q. Was Desiree always there?
19 A. Not always. Not always for the full
20 meeting, but she usually would stop by.
21 Q. Was Juan Perez ever there?
22 A. Never.
23 Q. What about Shawn Carter, was he ever
24 there?



146

1    A.   No.
2    Q.   While you were working at the 40/40
3  Club, did you have any other jobs other than your
4  telemarketing?
5    A.   No.
6    Q.   And where did you do your
7  telemarketing from?
8    A.   My friend's basement.
9    Q.   Was that a commission job?
10   A.   Yeah, but I didn't make money for
11 like six months when I started this job. So I
12 wasn't really a --
13   Q.   Sorry?
14   A.   I wasn't really -- I wasn't working,
15 you could say. I was just learning. I was
16 working on the side of him, like on the side,
17 just to watch what he did.
18   Q.   Telemarketing?
19   A.   I was telemarketing. I was more or
20 less just -- I would say sort of mimicking what
21 he was doing, just to learn the business from
22 that side.
23   Q.   What were you selling then?
24   A.   Mortgages.

147

1    Q.   Oh. Okay. If you had changed your
2  schedule to pick up a shift from someone else,
3  would you mark that on the schedule?
4    A.   No.
5    Q.   No. Did you submit anything in
6  writing saying, I changed my schedule?
7    A.   Sometimes you would. Sometimes you
8  wouldn't.
9    Q.   Who would you submit it to?
10   A.   Manager.
11   Q.   Who?
12   A.   A manager would sign it. I think if
13 you did it like far in advance with someone who
14 didn't want to get in trouble. Because if
15 someone was covering your shift, and they didn't
16 show up you'd be in trouble. So if there was a
17 bartender you didn't trust you would want to get
18 a signature. If it was somebody else, you know,
19 somebody asked me, you want to cover my shift,
20 they didn't really need a signature because they
21 know I'd show up. It wasn't a case of that
22 depending on who it was.
23   Q.   When you went to Atlantic City, did
24 you usually drive yourself?

148

1    A.   Always.
2    Q.   So you'd have records of gas, credit
3  cards, or tolls, or something?
4    A.   I don't have records.
5    Q.   No records.
6    A.   I would have records per se if I
7  took my parents' car. Maybe I would have their
8  E-Z Pass. I definitely -- I stood there multiple
9  times with my friend and his wife. So I used to
10 -- every time I stayed there, I stayed in their
11 hotel room.
12   Q.   Okay. So you never had to pay your
13 own hotel room?
14   A.   No, I stayed in my friends. I never
15 got compensated for anything. I have no money to
16 pay for a hotel room.
17   Q.   All right. So when you drove down,
18 did you use a credit card to buy gas or --
19   A.   I don't know.
20   Q.   Cash to buy gas?
21   A.   I don't know. I always -- I only
22 went down to Atlantic City less than seven times.
23   Q.   Okay. Were you ever disciplined for
24 failure to punch out?

149

1    A.   Not that I remember.
2    Q.   Other than tips, was there any other
3  benefits, like insurance or anything working
4  there?
5    A.   No.
6    Q.   No. When you closed out at the end
7  of the night, were you required to record your
8  tips that you had taken?
9    A.   Yeah.
10   Q.   Did you --
11   A.   I think the POSitouch machine.
12   Q.   Did you do that accurately?
13   A.   Never. We were always talking about
14 how you do as little as you want. Make sure that
15 it was a certain percentage of your total rings.
16   Q.   So you underreported your tips?
17   A.   Of course. She used to always tell
18 us, underreport, make sure it's a certain
19 percentage of your tips. So if you rang -- if
20 your drawer rang 4,000, make sure that we didn't
21 under ring it a certain amount.
22   Q.   What percentage do you -- were you
23 told to --
24   A.   I don't recall exactly the



### 150

1 percentage that she told us to ring. But we used
2 to ring it -- I mean everybody rang it very much
3 lower than what they usually made.
4     Q.  **Everybody did?**
5     A.  It had to be -- I mean as far as I
6 would know, I would say a good three quarters of
7 the people definitely did it. I'm not going to
8 speak on every single staff member. Certain
9 staff members maybe wanted to over claim. I
10 don't know what that benefit would be. But
11 specifically she had said, just make sure that
12 you write in a specific amount, so that it
13 doesn't come up.
14     Q.  **Do you know what the approximate**
15 **amount of tips you made at 40/40 Club?**
16     A.  Made or that I was paid?
17     Q.  **That you have?**
18     A.  That I took home?
19     Q.  **Uh-huh.**
20     A.  That I actually, physically took
21 home, per week I would make, say, 600, 800
22 depending on the week. It's very hard to say per
23 week what you actually make, because there was
24 many a times when I came in and stood there for

### 151

1 four hours, and then went home with nothing.
2     So it's very hard to give you an
3 exact number per week. But I can give you on a
4 Friday and Saturday what we used to make. During
5 the week it's definitely all up to depending on
6 what kind of party there was.
7     Q.  **What did you usually make on a**
8 **Friday or Saturday?**
9     A.  On Friday between two and three.
10 Saturday between three and four, usually.
11     Q.  **Now, other than the parties that you**
12 **worked at the service bar, how would it be that**
13 **the club would retain your tips if you got the**
14 **money and took it yourself?**
15     A.  The club would retain special party
16 tips. For instance, if there was a party being
17 going on that it was paid for via credit card,
18 whatever it might be, there would be a large
19 group of tips. We were never paid what we should
20 have been getting paid on that party.
21     Q.  **Okay. So other than the parties, is**
22 **what I'm saying.**
23     A.  Other than the parties?
24     Q.  **Yeah.**

### 152

1     A.  No, I never had a problem, other
2 than the parties.
3     Q.  **Now, the parties would be stuff**
4 **that's prepaid in advance or, do you know how**
5 **that worked?**
6     A.  We never really knew how exactly
7 they got paid. I just specifically knew of the
8 Sebastian Telfair party, because I grew up with
9 his family. I know them. I was specifically --
10 I know their whole family. I've known them for a
11 long amount of time. I worked the party, and she
12 put me back there, because she knew I was close
13 with them. And then I ended up going back there.
14 When we received the tips I had -- was shown by
15 his brother, that they paid a bill that was a
16 large sum, and I got hardly anything from it.
17     Q.  **Wasn't that a cash bar though?**
18     A.  The Sebastian Telfair party?
19     Q.  **Yeah.**
20     A.  He had a big tip in the club room,
21 that I was working in.
22     Q.  **I'm sorry. Wasn't it a cash bar,**
23 **the Telfair party?**
24     A.  It was half and half. We get paid

### 153

1 off of the bottles in the party. So when he came
2 in and buys 18 bottles of liquor per se, where we
3 get tipped out on that from the waitresses. The
4 waitresses specifically, he didn't have his
5 credit card that night on one thing. He had to
6 come back and pay it. When he came back and paid
7 the bill, the waitresses and us were never given
8 the right amount that we were supposed to be
9 given.
10     Q.  **And how do you know what the**
11 **waitresses were given?**
12     A.  Because we worked with them.
13     Q.  **So you're trusting that they told**
14 **you the truth?**
15     A.  I was with them when we all got
16 paid.
17     Q.  **So you saw their pay?**
18     A.  Yeah.
19     Q.  **And how much do you think you were**
20 **underpaid?**
21     A.  A couple of hundred.
22     Q.  **Each person?**
23     A.  I don't speak about anybody else. I
24 know about myself.



BRANDON STURMAN

154

1    Q.   Okay. So you think you were --
2 there should have been more tips to you in
3 that --
4    A.   Oh, yeah.
5    Q.   -- in that payment?
6    A.   Definitely.
7    Q.   Okay. Now, was the charge to the
8 Telfair a service charge -- listed as a mandatory
9 thing that the club put on, you're saying?
10   A.   Yes.
11   Q.   That's 20 percent, that's what you
12 wanted?
13   A.   I don't want the full 20 percent,
14 no. It got split up because we worked the party.
15 That's just one specific event, but this is
16 something that goes on through the course of you
17 working at this place.
18   Q.   You could only testify, I suppose,
19 as to what you know of; right?
20   A.   Well, of course. So that's why I
21 bring up this party.
22   Q.   That's fine. So we're talking about
23 this party. And you say you wanted the
24 percentage of the service charge to be

155

1 distributed to you?
2    A.   A percentage of what I earned, of
3 course.
4    Q.   Well, you earned it how?
5    A.   Because I worked the service bar,
6 okay. And it got packed in there. I was brought
7 out from the service bar to the actual party,
8 because the two bartenders were getting swamped.
9 The waitresses get paid, and they pay me in turn.
10   Q.   All right.
11   A.   So it's part of my commission.
12   Q.   I'm asking you whether that was --
13 was there any cash from which you got a tip that
14 night?
15   A.   I get a piece of that, of course.
16 Yes.
17   Q.   Okay. So there was cash distributed
18 that night?
19   A.   Of course.
20   Q.   And now you're saying that there was
21 an additional portion that was paid on a credit
22 card for which a service charge was put on?
23   A.   Of course.
24   Q.   All right. And now, you're saying

156

1 you want a portion of that service charge?
2    A.   Do I want it now, or did I deserve
3 it?
4    Q.   Well, that's what you're saying.
5    A.   I don't want it now. I deserved it
6 when it happened.
7    Q.   All right.
8    A.   And the same thing happened when
9 Johnny Damon had a party.
10   Q.   The same exact situation?
11   A.   Same exact situation. And I'm just
12 bringing up two specific celebrity parties. But
13 there was multiple parties that this always
14 happened too. As well as affairs where they
15 rented the whole club. Where we were supposed to
16 get more money and we never got money.
17        MR. KIRSCHENBAUM: I'm just going to
18    object to the use of the term "service
19    charge." It's a legal terms that the
20    client does not understand necessarily.
21   Q.   Did you ever observe Shawn Carter in
22 the club?
23   A.   Once.
24   Q.   Did you ever observe Juan Perez in

157

1 the club?
2    A.   Yes.
3    Q.   What was he doing there?
4    A.   Counting money.
5    Q.   Anything else?
6    A.   No.
7    Q.   Did you ever talk to him?
8    A.   Couple of times, nothing -- no
9 conversations like in depth.
10   Q.   What did you talk about -- hi, how
11 are you doing?
12   A.   No, just grab me a drink.
13   Q.   Are you aware of how back of the
14 house people were compensated?
15   A.   No, but I knew it was terrible.
16   Q.   You knew it was what, terrible?
17   A.   Yeah.
18   Q.   Okay. What was terrible about it?
19   A.   They used to work ridiculous hours.
20 Them is ten times worse than anything we ever
21 went through.
22   Q.   Do you know if they were paid?
23   A.   They were paid very sub par.
24   Q.   Were they paid more than minimum

