# EXHIBIT Z

Case 1:07-cv-03978-LAP   Document 42-27   Filed 02/29/2008   Page 1 of 12

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - -X

CELESTE WILLIAMS, LAUREN CRUZ, EMANUEL

O'NEALE, BRANDON STURMAN, LATRESHA HALL,

LAKEISHA MITCHELL, CHRISTINE BORBELY and

JANINE APONTE on behalf of themselves and

others similarly situated,

        Plaintiffs,

  -against-                Index No.

                            07cv3978

TWENTY ONES, INC., d/b/a THE 40/40

CLUB, SHAWN CARTER p/k/a JAY-Z,

JUAN PEREZ and DESIREE GONZALES,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - -X

        January 28, 2008

        1:26 p.m.

DEPOSITION of CELESTE WILLIAMS, a Plaintiff herein, taken pursuant to Notice, and held at the offices of Littler Mendelson, P.C., 885 Third Avenue, New York, New York, before Leeann Bertorelli, a Court Reporter and Notary Public of the State of New York.

DALCO REPORTING, INC. 170 Hamilton Avenue, White Plains, New York 10601
914.684.9009 Fax 914.684.6561 info@dalcoreporting.com 800.DAL.8779
49 W 37th Street, New York, New York 10018 212.679.6095 dalcoreporting.com

### 18

1  A. Yeah, I would have to have then.
2  Because I don't remember. Like I'm not -- so far
3  with dates when I worked at Circuit City, I
4  wasn't exact. Like which dates I worked there.
5  I do know I didn't work there at the same time.
6  So I'd have to have worked there after, after
7  that.
8  Q. How did you apply for work at the
9  40/40 Club?
10 A. I found it on Craigslist. Under the
11 restaurant jobs, they have a section for just
12 bartenders and waitresses and everything like
13 that. So I found it there. I sent a picture and
14 my contact information. And I got called in.
15 Q. Who did you send your picture and
16 contact information to?
17 A. There was just an e-mail address you
18 just send it to. A lot of people don't give
19 their real e-mails addresses. They have a
20 Craigslist address to apply to.
21 Q. Okay. And, I'm sorry, did you say
22 someone called you?
23 A. Either someone called me or I
24 believe they had an open call, but it may -- I

### 19

1  think -- I'm not sure. I don't really remember
2  if I was called, or if they had the open call and
3  I went down there.
4  Q. Okay. But at some point you went to
5  the 40/40 Club?
6  A. Yes.
7  Q. And who did you meet with?
8  A. I met with Desiree.
9  Q. And did you fill out any paperwork
10 at that time?
11 A. No.
12 Q. And Desiree interviewed you?
13 A. Yes.
14 Q. How long did that last?
15 A. Not long at all. I think I said I
16 didn't have a resume. I think I did have a
17 resume, and she told me, you don't really have
18 any experience, something like that.
19 Q. Do you still have a copy of that
20 resume?
21 A. It's updated since then, but I'm
22 sure I probably -- I might have one laying
23 around.
24 Q. You might have -- would that version

### 20

1  be saved on your computer perhaps?
2  A. No, because I have a new computer
3  since then.
4  Q. And tell me about when you met with
5  Desiree that first day.
6  A. She told me basically what I'd be
7  doing. She's like, okay, well, we'll have you
8  come in. And I was told what to wear, all black.
9  So I came in that day, and that's when I told
10 you I followed a server around that day.
11 Q. And that was the same day that you
12 came in for the interview?
13 A. No, it was maybe a couple of days
14 later.
15 Q. Okay. So it was Desiree who hired
16 you for the position?
17 A. Yes.
18 Q. Do you know if anyone else had any
19 involvement in that decision?
20 A. No.
21 Q. Did you discuss how you would be
22 paid?
23 A. Not at the time, the day, no.
24 Q. Okay. But you had an expectation

### 21

1  that you would make more than you had at Circuit
2  City?
3  A. Yes, because usually, so far with
4  tips and with also receiving a paycheck, it
5  usually tends to add up to more.
6  Q. How much did you make a week at
7  Circuit City?
8  A. Maybe -- I'm not really sure how
9  much I made a week.
10 Q. And how much did you make a week at
11 the 40/40 Club?
12 A. It was kind on and off. Cause it
13 was only based on tips, so it wasn't -- there was
14 no set.
15 Q. I guess, actually, if you started in
16 the middle of December and ended at the end of
17 December you only worked for about two weeks at
18 the 40/40 Club?
19 A. No.
20 Q. All right. Well, you started
21 sometime after December 9th?
22 A. Yes.
23 Q. And you stopped on December 31st?
24 A. Yes.

22

1   Q. So at the most, three weeks?
2   A. Yeah, I guess you could say three to
3   four weeks.
4   Q. Well, how could you say four weeks
5   if it was less than a month?
6   A. Okay. Well, three weeks.
7   Q. In those three weeks, do you recall
8   how much you made in tips?
9   A. No, I don't.
10  Q. Did you have to declare your tips?
11      MR. FREDERICKS: Objection.
12  Anything related to her making any
13  declaration for tips or filing tax
14  returns, number one, it's irrelevant.
15  Number two, there's a presumption against
16  the discoverability of this information.
17  Number three, it's protected by the Fifth
18  Amendment. I instruct you not to answer
19  any questions about you declaring
20  anything, and your tax returns.
21      MS. SHEINKIN: I didn't ask her
22  about her tax returns. I'm asking about a
23  process at the 40/40 Club.
24      MR. FREDERICKS: Well, you weren't

23

1   clear about that.
2       MS. SHEINKIN: That's fair. I'll
3   get back to it.
4   Q. Did you have to clock in at the
5   40/40 Club?
6   A. Yes.
7   Q. You needed to do that in order to
8   receive wages -- I'm sorry. In order to put in
9   customer's orders?
10  A. Yes.
11  Q. And did you clock in every day you
12  worked at the 40/40 Club?
13  A. Yes.
14  Q. Did you clock out?
15  A. Yes.
16  Q. And when you clocked out, were you
17  required to declare the amount of tips you had
18  made that day?
19  A. You had to - basically, you carried
20  all the money with you, so you get your tip out,
21  the whole bill of all the sales you made at the
22  end of the night. So you pay the house, which is
23  Desiree, the club; you give them all the money
24  that comes from the servers. And whatever's left

24

1   over is your tips. Out of those tips you have to
2   tip the bartender, the busser, and the food
3   runner.
4   Q. Uh-huh. My question was: When you
5   clocked out, were you required to declare how
6   much you had made in tips?
7   A. No.
8   Q. So you could clock out without
9   reporting any tips?
10  A. Uh-huh.
11  Q. And throughout your employment at
12  the 40/40 Club you were a server?
13  A. Yes.
14  Q. Do you know anyone else who worked
15  there when you began?
16  A. There was a girl named Candy; she
17  worked there. There was a guy named David.
18  Q. I'm sorry. Let me clarify. Before
19  you began working there, did you know anyone?
20  A. No.
21  Q. Okay. Go ahead. You were telling
22  me the people that you know were also employed
23  when you began. So you said Candy and David,
24  were they also servers?

25

1   A. Yes.
2   Q. Okay.
3   A. Who else, I think there was a girl
4   named Gloria. I think that was her name. I
5   don't remember. Who else? I don't really
6   remember. A whole bunch of other people.
7   Q. How did your employment end?
8   A. After December 31st I decided not to
9   go back.
10  Q. That was a voluntary decision?
11  A. Yes.
12  Q. You were not terminated?
13  A. No.
14  Q. Going back to your employment
15  application, you indicate that the reason for
16  leaving Circuit City was a conflict with wages.
17  A. Uh-huh.
18  Q. What do you mean by that?
19  A. It wasn't so much a conflict with
20  wage. I just wanted to make more money. At the
21  time I was a student, and I had stuff that I had
22  to handle. I needed to buy books, just so much.
23  And I didn't want to work there anymore.
24  Q. So your conflict with wages is you

7 (Pages 22 to 25)

Case 1:07-cv-03978-LAP   Document 42-27   Filed 02/29/2008   Page 5 of 12

CELESTE WILLIAMS

### Page 34

1  managers. Like usually people who run it; they
2  were there. Either Charlie, Meron, somebody was
3  there.
4      Q.  A manager, but not regular staff
5  that did administrative work, assistants?
6      A.  Yes.
7      Q.  Telephone receptionists?
8      A.  Oh, no, no.
9      Q.  So just tipped employees and a
10 manager?
11     A.  Uh-huh.
12     Q.  And the manager ran the meeting?
13     A.  Yes.
14     Q.  Do you recall at the meetings you
15 attended who that manager was?
16     A.  I forgot. It was one of the twins.
17 He had dreads. I don't remember his name.
18 Sometimes he'd be there; sometimes Charlie would
19 be there, or Meron, M-E-R-O-N.
20     Q.  Was Shawn Carter ever present for a
21 staff meeting?
22     A.  No.
23     Q.  Was Juan Perez ever present for a
24 staff meeting?

### Page 35

1      A.  No.
2      Q.  Did you understand that the tips you
3  received were income to you?
4      A.  Income, yes.
5      Q.  And that they were subject to a tax
6  withholding?
7      A.  No.
8      Q.  You didn't know that?
9      A.  No.
10     Q.  Did you know that the club was
11 withholding taxes on your tips from your regular
12 wages?
13     A.  No.
14     Q.  Other than what the club withheld,
15 did you pay any taxes --
16         MR. FREDERICKS: Objection.
17     Q.  -- for tips you earned at the 40/40
18 Club?
19         MR. FREDERICKS: Objection. I
20     instruct you not to answer that question
21     by the same basis that I had in my prior
22     objection.
23         MS. SHEINKIN: Well, your objection
24     was that it's irrelevant. And what she

### Page 36

1  received in tips and taxes paid on that is
2  relevant to this suit. It directly goes
3  to what wages she would be due.
4      MR. FREDERICKS: It's not only an
5  objection of relevancy; it's also
6  objection because the information isn't
7  discoverable, and she's got a Fifth
8  Amendment protection as well.
9      MS. SHEINKIN: Well, it is
10 discoverable if it is relevant.
11     MR. FREDERICKS: I instruct you not
12 to answer any questions regarding that.
13     Q.  Are you taking the Fifth Amendment
14 with respect to that question?
15     A.  Yes.
16     Q.  What time did the 40/40 Club open?
17     A.  I think about 11.
18     Q.  In the afternoon?
19     A.  Yes.
20     Q.  And when did it close?
21     A.  4, 4 a.m.
22     Q.  Did it ever close before 4?
23     A.  No.
24     Q.  There were no days when the club

### Page 37

1  closed early?
2      A.  No, not to my knowledge.
3      Q.  So when you were there it always
4  closed at 4?
5      A.  Yes.
6      Q.  Okay. And what would you do after
7  closing?
8      A.  After closing, you have to go to
9  wherever your section was for the day and scrub
10 the cubes, clean up, and make sure it was squeaky
11 clean. And wait for everyone else to finish.
12 Then after that you do your tip out, where you
13 hand in your bill for the night, and all the
14 money you had.
15     Q.  So you would clean before you cashed
16 out?
17     A.  I don't remember which way it was,
18 unless you cashed out -- I think you cleaned
19 before you cashed out.
20     Q.  So you were cleaning you still had
21 all that money on you?
22     A.  I think so. I don't remember which
23 way it went. I don't remember if you cashed out
24 while you cleaned. I don't remember which way it

CELESTE WILLIAMS

42

1  else may have that would refresh your
2  recollection?
3      A.  If they have them, yes.
4      Q.  What records?
5      A.  I don't know what you mean by "what
6  records." I guess me clocking in and clocking
7  out?
8      Q.  Other than that, are there -- do you
9  have any other evidence that would establish that
10 you worked more than ten hours in a day?
11     A.  Not really. Just knowing what time
12 I was going there.
13     Q.  What do you mean?
14     A.  Like I know what times I used to go
15 to work like --
16     Q.  And you think you went to work at
17 11:45 two or three times a week?
18     A.  Maybe like, yeah. I mean like two,
19 three times a week.
20     Q.  Is it your contention --
21     A.  But I'm not quite sure. I'm not
22 exact on how many times I did that a week. But I
23 know that there were times when I did go in at
24 11:45.

43

1      Q.  But the club didn't always open at
2  11:45; did it?
3      A.  I'm not sure. I don't think. But I
4  remember going there early.
5      Q.  Okay. And you'd only go there at
6  11:45 if the club was open at that time?
7      A.  Yes.
8      Q.  How was your schedule relayed to
9  you?
10     A.  Excuse me?
11     Q.  How was your schedule relayed to
12 you?
13     A.  It was like really long hours.
14     Q.  I'm wondering how you were informed
15 of what your schedule was going to be?
16     A.  I don't remember.
17     Q.  Do you know who made your schedule?
18     A.  I think you basically tell them what
19 time -- like what days you want to come in. You
20 put in for what days. I don't know if you get to
21 put the times. I don't remember if you get to
22 put the times down that you want to come in.
23     Q.  So you don't recall who made your
24 schedule?

44

1      A.  I know what days. I know they have
2  a sheet where you put in for what days you want
3  to work. But I don't know how -- I don't know if
4  you -- I don't remember if you get to put the
5  times down as well though.
6      Q.  Okay. But then someone made a
7  schedule based on your submissions?
8      A.  Yes.
9      Q.  Do you know who did that?
10     A.  No.
11     Q.  How many times did you submit a form
12 saying what you wanted your schedule to be?
13     A.  Like three or four times.
14     Q.  Did you ever ask for your schedule
15 to be changed after it had been made for the
16 week?
17     A.  No. Sometimes you could like -- if
18 you don't like it, you could see if another
19 server would work for you or switch days with
20 you.
21     Q.  Did you need to get approval for
22 that?
23     A.  I don't remember.
24     Q.  Do you have any specific knowledge

45

1  concerning the hours worked by any other
2  employee?
3      A.  No, but I know their hours are also
4  long. I'm not -- I don't -- I wasn't really
5  paying attention -- I don't pay attention to
6  other people's direct hours, like what time they
7  came, what time they left. But everyone worked
8  long hours.
9      Q.  But you only have specific knowledge
10 concerning your own hours?
11     A.  Yes.
12     Q.  Did you ever request any time off?
13     A.  No, that was basically covered in
14 your sheet. The days, whatever days you didn't
15 select, those are basically your days off, if it
16 was given to you.
17     Q.  Did you ever forget to clock out?
18     A.  No.
19     Q.  Do you know what the procedure was
20 if you forgot to clock out?
21     A.  No.
22     Q.  And you testified that you could
23 clock out without reporting your tips?
24     A.  Yes.

12 (Pages 42 to 45)

## Page 46

1   MS. SHEINKIN: I'm going to mark
2   this as Williams Exhibit C.
3
4   (Williams Exhibit C,
5   NOTICE OF DISCIPLINARY
6   ACTION, was marked for
7   identification.)
8
9   Q. Williams Exhibit C is a notice of
10  disciplinary action.
11  A. I don't remember not punching out.
12  Like not punching out, doesn't that mean that you
13  don't get your bill at the end of the night?
14  Q. By clocking out, I mean when you
15  were done with your shift you would clock out on
16  POSitouch to indicate that you were no longer
17  working for the night.
18  A. Yeah, but if you don't -- you get
19  your punch out the same time you get your bill at
20  the end of the night for the sales that you made.
21  So I don't remember not -- to my knowledge, I
22  don't remember not punching out.
23  Q. Well, what do you mean? Explain to
24  me what you mean by "punching out."

## Page 47

1   A. When you get your bill at the end of
2   the night for all the sales that you made, you
3   hand that in, and then you would signed out. You
4   go to the manager, and they sign you out.
5   They're standing right there, basically.
6   Q. Okay. Did you clock out on the
7   POSitouch system?
8   A. Yes.
9   Q. Is that separate from signing out?
10  A. No, because your bill is printed
11  from that as well.
12  Q. When you came in before you took any
13  orders you would clock in on the POSitouch
14  system.
15  A. Uh-huh.
16  Q. And that would be some number that
17  you would -- some employee number you could put
18  in?
19  A. Yes.
20  Q. And when you left for the day, would
21  you also punch in that number to leave?
22  A. I guess so, but I don't remember
23  doing that. I remember when you get your bill
24  and whatever food you ordered the manager swipes

## Page 48

1   their card; you got your discount for the food,
2   and you sign out. They sign you out.
3   Q. When you say "sign out," is that on
4   a piece of paper?
5   A. Punch out, like same thing like on
6   the machine.
7   Q. So you would physically punch out on
8   the machine?
9   A. No, I don't -- I believe that you
10  had to be punched out.
11  Q. Okay. So you don't have any
12  recollection of ever yourself clocking out using
13  the POSitouch system?
14  A. No.
15  Q. And is this your signature on the
16  bottom of exhibit -- Williams Exhibit C, where it
17  says sign?
18  A. Yes, it is.
19  Q. And this indicates that you did, at
20  least on one occasion receive a warning for
21  failing to punch out?
22  A. Yes, which I don't remember. But
23  it's on paper, so.
24  Q. You don't recall receiving this?

## Page 49

1   A. No, I don't.
2   Q. You don't recall signing this?
3   A. No.
4   Q. How are you assigned to the section
5   where you were going to be doing service for the
6   night?
7   A. Basically, when you came in, there's
8   like a map of the club; they had the upstairs
9   floor, and the downstairs floor. And you just
10  look for your name on the map.
11  Q. Do you know who created that?
12  A. Usually, the managers would write
13  your name on it.
14  Q. Who were the managers when you
15  worked at the 40/40 Club?
16  A. Charlie, Meron, and one of the black
17  guys. He had dreads. I don't remember his name.
18  But there were two of them. So I don't remember
19  which is which.
20  Q. Did they work there at the same
21  time?
22  A. One was there. Sometimes they were
23  both there. But they were all there when I was
24  there.

50

1   Q.  And you served both tables and
2   customers who were standing?
3   A.  Yes. Well, usually, not the ones
4   who stood, because they would just go to the bar
5   themselves.
6   Q.  So mostly tables?
7   A.  Yes.
8   Q.  All right. And let's go through the
9   process of how that worked.
10  A.  Uh-huh.
11  Q.  You would take their order --
12  A.  Basically, you stand at the door,
13  and when customers come in, you seat them and
14  take their orders. When you were finished you
15  give them their bill, and they pay you, whether
16  it's cash, credit cards, like that. And you just
17  go to the machine; you put the payment in, and
18  basically, you just keep the money on you.
19  Q.  Okay. And when you took the order,
20  that's something you would put into the
21  POSitouch --
22  A.  Uh-huh.
23  Q.  -- system? And when you brought the
24  food or drink, some people paid you cash?

51

1   A.  Yes.
2   Q.  Did they pay right away when you
3   brought the food -- did you bring the bill along
4   with the food and drink?
5   A.  No, you usually bring the bill after
6   the food.
7   Q.  Okay.
8   A.  Or they usually ask you, can I have
9   the bill now.
10  Q.  And if they give you cash, you would
11  take that cash --
12  A.  Yes.
13  Q.  -- and hold it for the rest of the
14  night?
15  A.  Yes.
16  Q.  And both the money that belonged to
17  the club for the sale, and your tip?
18  A.  Yes.
19  Q.  And you routinely tip 20 percent; is
20  that correct?
21  A.  Yes.
22  Q.  And that was a function that you on
23  the POSitouch system that you could add to each
24  bill?

52

1   A.  Yes.
2   Q.  And did you always do that?
3   A.  Yes.
4   Q.  And if people paid with a credit
5   card --
6   A.  Uh-huh.
7   Q.  -- you would go through the steps
8   you mentioned before?
9   A.  Yes.
10  Q.  And what would you do with those
11  documents?
12  A.  You keep the copy and the receipt,
13  and you keep it on you. So at the end of the
14  night you turn that in also.
15  Q.  And that's the cash out process you
16  were talking about?
17  A.  The what?
18  Q.  The cashing out process?
19  A.  Yes.
20  Q.  Tell me about that.
21  A.  At the end of the night when you
22  cash out? At the end of the night you get your
23  bill; it tells you how much you sold in food,
24  drinks, retails. And it basically tells you what

53

1   you have to pay the club. So the money that you
2   have on you, which is all the money from your
3   orders that you took for the whole day. So
4   whatever the total is, you count that out, and
5   turn that into the club with your credit card
6   statement, with the imprint.
7   Q.  So you would be giving the club the
8   money that you owed to the club, that you had
9   been holding --
10  A.  Uh-huh.
11  Q.  -- during your shift? So then each
12  night when you left the club, you went home with
13  all the tips you had earned during the shift,
14  other than what you tipped out?
15      MR. FREDERICKS: Objection. Assumes
16  facts not in evidence. You could answer
17  the question.
18      THE WITNESS: Huh?
19      MR. FREDERICKS: Answer the
20  question.
21  A.  I'm sorry. Could you repeat that.
22      MS. SHEINKIN: Would you mind
23  reading it back.

CELESTE WILLIAMS

### 54

1  (The requested testimony was
2  read back.)
3
4  A. Yes.
5  Q. And you tipped out, I believe you
6  said, to bussers and runners and bartenders?
7  A. Uh-huh.
8  Q. How much, do you recall?
9  A. There was a percent for each one.
10 Q. And did you do that before or after
11 cashing out?
12 A. You do that after you cash out.
13 Q. Was that percent of your sales or
14 percent of your tips?
15 A. Tips.
16 Q. I believe you testified that you
17 worked at a party during your employment?
18 A. Uh-huh.
19 Q. Was it just one party or more than
20 one?
21 A. I did -- private parties, probably
22 more than one. But the one where I made the most
23 money, it was just two of us in there.
24 Q. Okay. And did you receive tips for

### 55

1  the parties?
2  A. Yes.
3  Q. And did you receive -- strike that.
4      How often did you work more than 40
5  hours in a week?
6  A. Probably, every week.
7  Q. So of the three weeks you may have
8  worked at the club, you allege you worked more
9  than 40 in each of those weeks?
10 A. Yes. To my knowledge, yes.
11 Q. Do you have any documents that would
12 support that claim?
13 A. No, because I never got tax forms.
14 I never received a W2.
15 Q. Did you receive any checks from the
16 40/40 Club?
17 A. No, I did not.
18 Q. Did you receive any paychecks or pay
19 stubs from the 40/40 Club?
20 A. No, I did not.
21 Q. Did you ever ask for one?
22 A. I asked Charlie. I asked him,
23 aren't you supposed to give checks also? And he
24 said, no. Desiree keeps them. She claims them

### 56

1  for her tax, because she knows that you guys
2  won't. So at least for the benefit of the club.
3  Q. So he said that Desiree had your
4  paycheck?
5  A. He said that she keeps them. She
6  claims them for her taxes.
7  Q. What did you understand him to mean
8  by that?
9  A. I didn't really understand. I was
10 still confused like, as of, you know, how could
11 she do that.
12 Q. Did he explain that the amount of
13 your wages was going to taxes that you owed?
14 A. No, he did not.
15 Q. And that's not what you
16 understood --
17 A. No.
18 Q. -- him to be saying? Did you ever
19 ask Desiree about it?
20 A. No, I didn't.
21 Q. Why not?
22 A. I didn't really ask her anything.
23 Q. When was that conversation with
24 Charlie?

### 57

1  A. I'm not sure. But I had been
2  working there a little while. And then I asked
3  him that.
4  Q. Did he say anything else --
5  A. No.
6  Q. -- during that conversation?
7  A. He did not.
8  Q. Did you ask him any other questions?
9  A. No.
10 Q. I'm going to refer you back to the
11 declaration, which we've marked as Exhibit A,
12 Williams Exhibit A. In Paragraph 3, you say that
13 you were employed from approximately November
14 2005 through January 2006?
15 A. Uh-huh.
16 Q. Now, is it your recollection that
17 you began in December of 2005?
18 A. Yes.
19 Q. And that you ended in December of
20 2005?
21 A. Yes.
22 Q. Who did you speak with concerning
23 the fact that you did not receive wages, what
24 employees?

15 (Pages 54 to 57)

62

1  (Williams Exhibit D,
2  PAYROLL SHEET, was
3  marked for identification.)
4
5  Q. Looking at Williams Exhibit D, do
6  you recall receiving a check from the 40/40 Club
7  in the amount of $136?
8  A. No, I do not.
9  Q. Is it your testimony that you've
10 never received any check from the 40/40 Club --
11 A. Yes, it is.
12 Q. -- in any amount?
13 A. Never.
14 Q. Were you ever required to pay for
15 breakages or spills at the 40/40 Club?
16 A. I know if you had to -- if you
17 messed up on a drink and -- let's say like for
18 instance, if someone orders a drink, and punch it
19 in wrong, you'd have to pay for it at the end of
20 the night because that's not what the customer
21 ordered.
22 Q. What's your basis for that
23 statement?
24 A. So far as breakages, I'm not sure

63

1  about that. But if you ordered something that a
2  customer didn't want, you had to pay for that.
3  Q. Did you ever have to pay for that?
4  A. Yes, I had to pay for drinks before.
5  Q. When did that occur?
6  A. When I was working there. It
7  happened often.
8  Q. Who told you that you had to pay?
9  A. When the managers tell you that.
10 Like if you put something in, you have to pay for
11 that. Unless you can resell it you pay for it.
12 Q. What manager told you that?
13 A. I don't remember which one, but that
14 was the policy. Like if there was something, you
15 sold a drink and it had ice in it. They usually
16 take the ice out of it and try to resell it, so
17 they didn't have to pay for it.
18 Q. Do you have any specific
19 recollection of a time when that occurred?
20 A. Yes.
21 Q. Tell me about it.
22 A. I think a customer ordered -- I
23 think she ordered rum and coke, and I think I
24 gave her like vodka and coke or Hennessey and

64

1  coke, something that she didn't order. She's
2  like, no, I didn't order this. So I had to pay
3  for it at the end of the night. I had to give
4  her what she wanted, and I pay for it.
5  Q. Wasn't there a function that you
6  could void an order if you put it in wrong?
7  A. Not that I know of. But I paid for
8  it, so.
9  Q. And do you recall who told you that
10 you had to pay for it?
11 A. One of the managers.
12 Q. So you told him that you had put in
13 the wrong order?
14 A. Yeah.
15 Q. And what did he say?
16 A. Pay for it.
17 Q. And do you recall what manager that
18 was?
19 A. No, I don't.
20 Q. Do you recall when it occurred?
21 A. Not a specific date, no.
22 Q. How much did you pay?
23 A. Probably about 15-, 16-, $17,
24 somewhere in between there.

65

1  Q. For a -- was that a rum and coke,
2  you said?
3  A. Yes, something like -- I mean not
4  specifically if that was the exact drink, but
5  that was an example.
6  Q. Well, what drink would be 15- or
7  $17?
8  A. Well, their drinks are expensive all
9  together, so --
10 Q. Any other time?
11 A. Not that I could think of right now,
12 no.
13 Q. Did you ever break anything?
14 A. No.
15 Q. Did you ever spill anything?
16 A. Spills, I think someone bumped into
17 me, and I may have like spilled like one of my
18 shots, or something.
19 Q. But you didn't have to pay for it?
20 A. I bought them myself anyway so, to
21 resell.
22 Q. Can you explain that?
23 A. Like, usually, if they have a party
24 and you feel like you're not making enough tips,

17 (Pages 62 to 65)

**66**

1  you could buy, like make shots and purchase them
2  for like a small amount. And then charge the
3  customer higher to make more money.
4     Q. Is that because you received an
5  employee discount on the shots?
6     A. No.
7     Q. Why would it be more expensive for
8  the customer than for you?
9     A. That's -- a lot of the servers did
10 that. It was just to make more tips.
11    Q. So you just charge the customer more
12 than it cost?
13    A. Yes.
14    Q. Do you have knowledge concerning any
15 other employee who had to pay the club for
16 breakages or spills or wrong orders?
17    A. No.
18    Q. Did you ever have to pay a
19 customer's bill with your own money?
20    A. If they walked out, you'd have to
21 pay for it.
22    Q. Did that happen to you?
23    A. No, it didn't.
24    Q. Did a customer ever walk out without

**67**

1  paying?
2     A. Not to me, no.
3     Q. Do you have knowledge about any
4  other employee who was required to pay a
5  customer's bill?
6     A. No, I don't.
7     Q. In Paragraph 11, you also say that
8  if a patron did not sign their credit card
9  receipt, defendants retained the disputed tip for
10 90 days.
11    A. Yeah, because that's your fault that
12 they didn't sign it. That's, you know, you being
13 irresponsible, so you have to pay for that.
14    Q. Did you ever have a customer not
15 sign their credit card receipt?
16    A. Not to my knowledge. I think I had
17 them sign --
18    Q. Are you aware of any other employee
19 who had their tip retained for 90 days?
20    A. No.
21    Q. And you refer to Exhibit A to your
22 document, where in this document do you see the
23 policy that the club would retain a tip for 90
24 days if a credit card was not signed?

**68**

1     A. It doesn't say that. I still have
2  my 40/40 pamphlets at home with all the policies.
3  But I don't see that here.
4     Q. You have a document with that
5  policy?
6     A. I'm sure it's in there. I have the
7  books they gave like with the food, the prices,
8  and then the employee manual.
9     Q. So earlier when you said that you
10 didn't have any documents concerning your
11 employment at the 40/40 Club --
12    A. That's the only thing. I didn't
13 consider like a pamphlet, a work pamphlet, as a
14 document, but yes, that is a document.
15    Q. You have that?
16    A. Yes.
17    Q. Do you have any -- did you take any
18 notes on it?
19    A. No.
20    Q. Do you have any other documents at
21 home concerning, in any way, your employment at
22 the 40/40 Club?
23    A. No, just the book. That's it.
24    Q. Did you ever complain about any of

**69**

1  the issues raised in your complaint to anyone at
2  the 40/40 Club?
3        MR. FREDERICKS: Objection. You can
4     answer.
5     Q. You can answer.
6     A. No.
7     Q. You didn't raise any of the issues
8  at the staff meetings?
9     A. No. I had like issues with servers
10 being rude. Like I, you know, complained about
11 that.
12    Q. You complained about other
13 co-workers, but not about any of the payroll
14 practices of the 40/40 Club?
15    A. No.
16    Q. Do either Shawn Carter or Juan Perez
17 have an office in the club?
18    A. Juan.
19    Q. Where's his office?
20    A. Second floor. It's like the kitchen
21 room upstairs also. It's like his office is in
22 there.
23    Q. Can you describe the office?
24    A. I know it's like more than one

CELESTE WILLIAMS

**Page 70**

1  office. I know there's -- in the kitchen, you
2  walk in, and there's like the bartender -- the
3  bartenders work right there. And you go up; you
4  make a right, and there's like offices, a desk
5  there. And I think there's another office in the
6  back. But I just know about the desk and stuff
7  right there in the front.
8  Q. But that's not Juan Perez's desk?
9  A. No. I think that's like usually
10 where the secretary works. I know Desiree used
11 to be there sometimes. Sometimes Juan would be
12 there. But I think his office is further back,
13 either -- there's like more rooms inside the
14 rooms, so I don't know.
15 Q. Okay. But Shawn Carter doesn't have
16 an office?
17 A. Not that I know of.
18 Q. Do you know if Mr. Perez did in his
19 office?
20 A. No, I don't.
21 Q. Do you know if he was doing work at
22 all?
23 A. No, I don't.
24 Q. Have you met Mr. Perez?

**Page 71**

1  A. Yes.
2  Q. How many times?
3  A. Not that many times. I didn't
4  really associate with him like that in the club.
5  I didn't really see him that often.
6  Q. Did you have any conversations with
7  him?
8  A. No.
9  Q. Did he ever --
10 A. One time I think, one of the servers
11 had -- gave him some food, and she asked me to
12 give him napkins. And that's probably like --
13 that's about it.
14 Q. Other than in a service capacity,
15 did he ever instruct you to do anything?
16 A. No.
17 Q. Do you have knowledge of any
18 employee that Mr. Perez has hired or promoted?
19 A. No.
20 Q. Do you have any knowledge of any
21 employee that he's disciplined or terminated?
22 A. No.
23 Q. Do you have any knowledge of any
24 club policies or procedures that he established?

**Page 72**

1  A. No, I don't.
2  Q. Have you met Shawn Carter?
3  A. No.
4  Q. Had you ever seen him in the club?
5  A. No.
6  Q. Have you ever spoken with him?
7  A. No.
8  Q. Do you have any knowledge of any
9  employee that Mr. Carter has hired or promoted?
10 A. No.
11 Q. What about any employee that he has
12 disciplined or terminated?
13 A. No.
14 Q. Do you have knowledge of any club
15 policies or procedures that he set?
16 A. No.
17 Q. Do you have any knowledge of any
18 control at all that was exercised either by Mr.
19 Carter or Mr. Perez?
20     MR. FREDERICKS: Objection; form.
21     Vague. You can answer.
22 A. No.
23 Q. Do you have knowledge of how
24 employees, other than servers and bartenders,

**Page 73**

1  were compensated?
2  A. No.
3  Q. Do you know if other employees were
4  subject to the same policies that you were --
5  A. Servers?
6  Q. -- other than servers or bartenders?
7  A. No, I don't.
8  Q. Have you talked with any current or
9  former employees, other than Candy, concerning
10 your claims in this lawsuit?
11 A. No.
12 Q. Have you communicated at all with
13 any of the other plaintiffs or opt-in plaintiffs
14 in this lawsuit?
15     MR. FREDERICKS: Objection.
16     Objection. Privileged. Don't answer.
17     MS. SHEINKIN: Whether she did or
18     not is not privileged. And I believe she
19     answered, no.
20 Q. Are you aware that Lauren Cruz has
21 withdrawn from this lawsuit?
22 A. No.
23 Q. Are you aware that Shawn Mohammad
24 has withdrawn his participation from this

19 (Pages 70 to 73)