1   somebody tipped you on the credit card, you
2   receive that money. I'm not sure if they gave it
3   to you afterwards or prior; I don't remember the
4   details.
5            But you received what you earned on
6   the tips, unless there was a problem with the
7   credit card transaction. If they felt that it
8   wasn't sufficient then they would take your
9   money.
10      Q.    And you're still referring to the
11  cash out procedure?
12      A.    Right.
13      Q.    What would be a problem with the
14  credit card?
15      A.    If they felt the signatures weren't
16  enough or you missed, you know, you didn't take a
17  number down, or something was off.
18      Q.    And when you say "they would take
19  your money," who --
20      A.    Management.
21      Q.    -- are you referring to?
22      A.    Management.
23      Q.    Was there somebody in particular you
24  were working with?

```
 1        Q.    Was it a man?
 2        A.    It was a man.  It was a man.
 3        Q.    But it wasn't David?
 4        A.    It was either David, Sheldon, or
 5   Sherwin.  I don't remember which one of the
 6   three.
 7        Q.    And do you have any documents --
 8        A.    No.
 9        Q.    -- evidencing that?  Did you hold on
10   to the receipt at that time?
11        A.    No.
12        Q.    Did the other server have the
13   receipt?
14        A.    I'm not sure.
15        Q.    So other than those three occasions,
16   at the end of every night you would leave with
17   all of the tips --
18        A.    Right.
19        Q.    -- that you had received other than
20   what you tipped out?
21        A.    Correct.
22        Q.    And you referred to a report, was
23   that a sales journal report?
24        A.    You mean as far as when you cashed
```

1  stubs?

2  A.    Well, I don't have any pay stubs
3  now.  I did receive a couple, and I discarded
4  them.

5  Q.    And you don't recall the dates that
6  they reflected?

7  A.    No.

8  Q.    All right.  In that paragraph, you
9  say that based on conversations with other
10 employees of the 40/40 Club, it was a common
11 practice of defendants not to pay overtime.  This
12 is Paragraph 6 of the declaration.  What other
13 employees did you have this conversation with?

14 A.    One employee specifically said this
15 is the way things are, Larry.  And that's how
16 things are done, basically.

17 Q.    Can you backtrack a little, and tell
18 me about that conversation.

19 A.    Well, he basically was saying, if
20 you don't like the way things are, then don't
21 work here, that kind of thing.  This is how it
22 works.

23 Q.    Is this because you were complaining
24 about something?

1     A.     I must have been, yeah.

2     Q.     And what were you complaining about?

3     A.     I think it's probably not receiving
4  money, like on certain -- probably on a certain
5  period where I wasn't earning any -- like I
6  wasn't making a lot of tips because I was new.
7  And I wasn't receiving a check most likely.
8  Something of that nature.

9     Q.     Do you recall any conversation about
10 overtime?

11    A.     Not specifically, no.  We weren't
12 concerned with overtime necessarily.

13    Q.     Okay.  You also say that you
14 witnessed other employees not receiving overtime?

15    A.     Right.  We all worked there, and
16 nobody received overtime.

17    Q.     How do you know what anyone else
18 received or did not receive?

19    A.     I believe.  I don't know for a fact,
20 but I believe that -- they said that's how things
21 are.  And I wasn't receiving it, so I believe
22 that was the situation.  So all employees were
23 receiving the same, unless there was some
24 favoritism going on that I wasn't aware of, which

1    I doubt.

2         Q.    Who told you they were not receiving
3    overtime?

4         A.    It was just common.  There was a
5    certain amount of employees, and we would all
6    discuss this.  I mean the specific ones -- I
7    indicated the ones that I remember.  I don't
8    remember the other people that I spoke to.

9         Q.    All right.  But I think you said
10   earlier that you didn't have any conversations
11   about overtime in particular?

12        A.    Not overtime, just pay in general.

13        Q.    About not receiving paychecks?

14        A.    Right.

15        Q.    Okay.  But you did receive
16   paychecks?

17        A.    Yeah.  A certain period, I would go
18   in and ask for them, because I wasn't receiving
19   them.  So I wanted pay stubs.  The majority of
20   them, I believe, were zeroed out.

21        Q.    Okay.  Where did you go to get your
22   paychecks?

23        A.    Go into the office.

24        Q.    Okay.  They were in a box?

1      A.    Not that I remember, any specific
2  restaurant where I worked where I received no
3  money at all.
4      Q.    Are there restaurants that you
5  worked at where you made more in tips than at the
6  40/40 Club?
7      A.    Some were pretty close.
8      Q.    Where?
9      A.    Josie's.
10     Q.    Is that it?
11     A.    Yeah, pretty much.
12     Q.    "Pretty close," do you mean as much
13 or --
14     A.    Like as far as like 200-, $300 a
15 night, yeah.  That's close.  That's as close as
16 it got.
17     Q.    So you made $200 a night less at
18 Josie's?
19     A.    No, I'm saying as far as when I made
20 two to $300 at the 40/40, it was similar to what
21 I was making at the other restaurant.
22     Q.    Was that an average night, 200-,
23 $300, or was that a low night?
24     A.    At what restaurant?

1   where checks were kept for employees?
2        A.   No.
3        Q.   You don't have any specific
4   knowledge of wages or tips that other employees
5   received?
6        A.   No.
7        Q.   When you say it was a common
8   practice not to the pay employees who received
9   tips a wage, you're referring to servers and
10  bartenders?
11       A.   Uh-huh.
12       Q.   Do you have any knowledge as to how
13  other employees were paid?
14       A.   I'm assuming by a pay rate.
15       Q.   You don't have any specific
16  knowledge?
17       A.   No.
18       Q.   Did anyone, other than a server or
19  bartender, ever complain about not receiving the
20  correct wage?
21       A.   Not to me.
22       Q.   Paragraph 5, you say based on
23  conversations with LaToya and other employees,
24  you knew it was a common practice to not provide

```
 1   paychecks.
 2        A.    Uh-huh.
 3        Q.    We talked about this, you did
 4   receive paychecks?
 5        A.    Right.
 6        Q.    But you never -- did you ever tell
 7   LaToya, hey, they're available?
 8        A.    No.
 9        Q.    What did LaToya --
10        A.    I don't remember telling her that,
11   specifically.
12        Q.    What do you recall about the
13   conversation you had with LaToya?
14        A.    That we started working together.
15   We started pretty much together.  And we were
16   complaining about not receiving checks, having
17   bad sections, that kind of thing.
18        Q.    Okay.  And what other employees are
19   you referring to?
20        A.    When I -- where?
21        Q.    In Paragraph 5.
22        A.    The ones that worked there.  The
23   ones that I mentioned.  The ones that I recall.
24   The three people that I recall, other than
```

1    LaToya, which were --

2        Q.    Well, the only other specific
3    conversation you told me about was with Larry?

4        A.    Right.  Specific conversation about
5    that.  And he told me that information.  When we
6    discussed -- LaToya and I discussed the fact that
7    we never received the checks.  This was prior to
8    me going into the office, and demanding that I
9    receive my paycheck.

10       Q.    Okay.  So you never had a
11   conversation with employees about not receiving
12   paychecks after you had, in fact, received
13   paychecks?

14       A.    Well, no.  Because at the time I was
15   aware that the paychecks were valued at nothing,
16   therefore, receiving them pretty much meant -- I
17   never went and talked to anybody specifically
18   about it afterwards.

19       Q.    How often did you go in to receive
20   your pay stubs?

21       A.    I may have went in a couple times --
22   well, more than a couple of times, sporadically.
23   I don't remember.  I don't remember.

24       Q.    And you still wanted to have this

1   But I don't think I looked at it specifically.  I
2   don't remember looking at it.
3       Q.   So you don't recall whether or not
4   you have seen this document before today?
5       A.   I -- like I said, I read the
6   declaration.  I glossed over the documents.  I
7   wasn't specifically sure what they all meant.
8       Q.   Okay.  Prior to signing this
9   declaration, had you ever received this document
10  before?
11      A.   No.
12          MR. KIRSCHENBAUM:  Objection.  She
13      answered the question before you asked it.
14      Q.   Did you file a tax return in 2006?
15          THE WITNESS:  Do I have to answer
16      that?
17          MR. KIRSCHENBAUM:  You can answer
18      that.
19      A.   Oh, no, I didn't.
20      Q.   In Paragraph 10, you say that you
21  believe a portion of your tips were retained by
22  defendants.  But you testified earlier that you
23  were holding the tips throughout the whole night.
24  So what portion of your tips --

```
 1   went by to ask --
 2        A.    No.
 3        Q.    -- if you could?  When you went into
 4   the office to ask for your pay stubs, were they
 5   given to you right away?
 6        A.    Fairly.
 7        Q.    Was it on the same day?
 8        A.    Yes.  They'd say, come back in a
 9   minute or one second, and then I'd go get it.  Or
10   they would give it to me right away.
11        Q.    So it was just a couple of minutes
12   at most?
13        A.    Right.
14        Q.    Okay.  And they were available for
15   you when you went to pick them up?
16        A.    Yeah, pretty much.
17        Q.    Did you ever ask, you know, what day
18   are they usually available?  So that you could
19   come in on a more regular basis?
20        A.    No, I don't remember that.
21        Q.    So you just went whenever you felt
22   like getting them?
23        A.    Pretty much.
24        Q.    In Paragraph 11, you say, if a
```

1  patron did not sign their credit card receipt
2  defendants retained the disputed tip money for 90
3  days. And I believe you testified that on one
4  occasion that happened to you?
5      A.   Right.
6      Q.   And you were disciplined on that
7  occasion?
8      A.   Yeah, either the payment or the tip
9  was withdrawn from what you earned.
10         MS. SHEINKIN: Can we mark this as
11      whatever's next.
12
13         (Gillette Exhibit G,
14         NOTICE OF DISCIPLINARY ACTION,
15         was marked for identification.)
16
17      Q.   Gillette Exhibit G is a notice of
18  disciplinary action. Do you recall receiving
19  this document?
20      A.   No, but that's my signature.
21      Q.   So you did receive this document at
22  some point?
23      A.   I signed it. That's my signature.
24      Q.   Do you recall when this occurred?

1    A.    I strongly don't believe I signed
2 any kind of paperwork.
3    Q.    What about the sales report or --
4    A.    I think I held on to something that,
5 you know, was evidence that something was taken
6 away from me.
7    Q.    But you no longer have that
8 document?
9    A.    No.
10   Q.    You referred to experiences of other
11 employees at the 40/40 Club having tips retained.
12 What employees are you referring to?
13   A.    Other employees that worked there.
14   Q.    Do you have specific knowledge of
15 any other employee having their tip retained
16 because of a credit card dispute?
17   A.    I'm not sure it's credit card.  I
18 know like the young lady I spoke of, LaToya, I
19 know she had issues with money being taken away
20 from her.
21   Q.    What were the circumstances?
22   A.    I don't recall.
23   Q.    What's the basis for your knowledge?
24   A.    She told me.

```
 1      Q.    But you weren't required to pay for
 2   it?
 3      A.    I don't think so, no.  No.
 4      Q.    You say that you personally
 5   witnessed this happen to another employee?
 6      A.    Yeah, I think a girl -- I think
 7   either something happened with a bottle of
 8   champagne, and I think the house made her pay for
 9   it.
10      Q.    What girl?
11      A.    I don't remember.
12      Q.    Was it a server or a bartender?
13      A.    Server.
14      Q.    And you saw the bottle break?
15      A.    No.  She -- I think it was something
16   she said afterwards.
17      Q.    So you did not personally witness
18   it?
19      A.    No.
20      Q.    So that's a false statement in
21   Paragraph 14, where you say you personally
22   witnessed this happen to another employee?
23            MR. KIRSCHENBAUM:  Objection.
24      That's a misconstruance.
```

```
 1   to?
 2        A.    The house.
 3        Q.    In particular --
 4        A.    The restaurant.
 5        Q.    -- who she handed the money to?
 6        A.    I don't know.
 7        Q.    Because you weren't there?
 8        MR. KIRSCHENBAUM:  Objection.
 9   That's not what she said.
10        Q.    Is it because you weren't there?
11        A.    I was there on the day it happened.
12   I wasn't in the room when she handed the money
13   over, no.
14        Q.    Does Shawn Carter have an office in
15   the club?
16        A.    Not that I was aware of.
17        Q.    Did Juan Perez have an office in the
18   club?
19        A.    Yeah, in the back.
20        Q.    Where that was office?
21        A.    Behind the front office.
22        Q.    Was that his personal office?
23        A.    I guess a personal lounge area.  I
24   don't know if it was an office.  I don't remember
```