1   drawer. So you don't punch in. But it made no
2   difference, because they don't track your hours
3   and give you a paycheck anyway.
4       So for the first couple of weeks, I
5   probably punched in every single time. After
6   that, probably only when I had to.
7       Q.  And what about punching out?
8       A.  No, only when you had a -- a drawer.
9   I wouldn't -- if you don't punch in, you don't
10  punch out.
11      Q.  Okay. What was the latest time of
12  day you worked?
13      A.  What do you mean --
14      Q.  Well --
15      A.  -- to start working?
16      Q.  Yeah.
17      A.  To start my shift or to end my
18  shift?
19      Q.  Both.
20      A.  Well, the club closes at 4. So you
21  actually stopped working after 4 serving drinks.
22  But you can stay there to work till as late as 7
23  in the morning I've been there. Starting shifts,
24  I think the club bar, we used to start at 10:00.

1  Q. Sitting here do you have any idea, number of hours you worked in any particular week?

4  A. No. Do I have proof, no.

5  Q. Okay. And what about at home, any place, do you have that?

7  A. No, because there was no -- no stubs, no anything to prove about anything.

9  Q. Okay. Did you ever ask for a pay stub?

11 A. Always.

12 Q. Who did you ask?

13 A. Her.

14 Q. Who's her?

15 A. Desiree. I'm sorry.

16 Q. And what was Desiree's response to you when you asked for a pay stub?

18 A. What do you want a pay stub for.

19 Q. Okay. And you said, I want it?

20 A. I said I want it, because if I'm getting zeros, and my paycheck is zero, I want to at least see that I'm paying taxes.

23 Q. Okay. And you never got one?

24 A. Never.

1  Q. Do you know of anybody else who
2  asked for a pay stub and didn't get one?
3  A. Nobody ever got pay stubs. It was
4  actually a joke when we used to say -- when I
5  said, am I going to get a pay stub? And they
6  said, you're never getting a pay stub here.
7  Q. What about people who were not in a
8  tipped position, do you know what they got?
9  A. No.
10 Q. Office workers, do you know what
11 they got?
12 A. No.
13 Q. Receptionists, do you know what they
14 got?
15 A. No, I don't know. There wasn't that
16 many people like that.
17 Q. So, can you name anyone who you've
18 discussed with the fact that you didn't get a pay
19 stub?
20 A. Everybody that I've worked with
21 there.
22 Q. Can you name somebody who you
23 actually discussed it with?
24 A. No.

1   Q. You cannot?

2   A. I don't want to sit here and name
3   names of people. It's a broad thing. You name
4   people that I've worked with, there were many,
5   many, many people that I've worked with. And
6   everybody experienced the same exact thing there.

7   Q. My question to you is: Can you name
8   anyone that you discussed the fact that you
9   didn't get a pay stub with?

10  A. No.

11  Q. Do you know of your own knowledge
12  the work hours of any other employee of the 40/40
13  Club?

14  A. Did I know how many hours they
15  worked?

16  Q. Uh-huh.

17  A. Definitely.

18  Q. Okay. Who do you know how many
19  hours they worked?

20  A. Every single bartender that worked
21  there.

22  Q. And how do you know what their hours
23  were?

24  A. I worked with them.

1      A.      Why would I identify a specific
2  person? I won't identify a specific person.
3  It's a broad number. There's every single that
4  worked there. It's not like some people thought
5  that Desiree was doing the right thing, and some
6  people -- everybody knew what she was doing.
7          This was an obvious, common thing.
8  So there was no specific conversation that you
9  want me to recollect and say, okay, I spoke to
10 person A at this time and they told me in
11 November 1st, I worked 44 hours a week. No,
12 there's no such thing as that. I don't have
13 that. I can't prove that. I can't say that.
14 There's nothing to, you know.
15     Q.      Okay. Did you ever forget to punch
16 out of work at the end of the day?
17     A.      Definitely.
18     Q.      Did you get a W2 form?
19     A.      Never.
20     Q.      Did you pay taxes in '06?
21     A.      Yes.
22     Q.      And did you indicate how much taxes
23 had been withheld from your income in '06?
24          MR. KIRSCHENBAUM:  Objection.  I'm

1  ensued.

2  Q. What conversation ensued with
3  Desiree after she finally spoke to you?

4  A. We had an argument.

5  Q. Yes. And what was that about?

6  A. She told me that -- she goes, I had
7  your tax returns. And I said, Desiree, I called
8  50 times asking for my tax returns, asking to
9  speak to you, left you multiple, multiple
10 messages. You didn't want to -- you didn't want
11 to take my phone calls, you didn't want to send
12 me anything, you didn't want to do anything.

13       And now after all of this now you're
14 taking my phone call, because it was in the paper
15 that they're having a lawsuit against you.

16       So I was mad. Obviously, she was
17 mad. I definitely said things that I shouldn't
18 have said, and so did she. So there's no reason
19 to document what she said, because I said stupid
20 stuff myself.

21       THE WITNESS: That I do apologize
22    for personally. It has nothing to do with
23    here.

24 A. But she also said that she was going

1  to ruin my tax life.  I mean, in that same
2  conversation.  And then I said, you know what,
3  I'm never going to call again about it.  I'm
4  never going to answer anything.  I kept the 1099
5  check.  And then here we are today.
6      Q.    Okay.
7           MR. KIRSCHENBAUM:  I'm just going to
8      confer with my client for a second.
9           MR. MARKS:  Okay.
10
11          (An off-the-record discussion
12          was held.)
13
14 BY MR. MARKS:
15     Q.    So there's a lot of information in
16 there that you just gave me.  That's fine.  But I
17 have to go back a little bit.
18     A.    You could ask me whatever you'd
19 like.  I have nothing to hide here.
20     Q.    All right.  So when did you get the
21 1099 check?
22     A.    In the summertime.  I called her the
23 moment after I got it.
24     Q.    The summertime of what?

1    Q.    And sometimes you got nothing zeroed
2    out?
3    A.    Hardly, but here I would make more
4    money. So it wouldn't have -- if I was getting a
5    zeroed paycheck, where I was paying my taxes, it
6    wouldn't have surprised me on certain weeks.
7    Because when the club did do good, we did well.
8    Q.    Okay. And that was discussed with
9    everybody, that was their understanding of why
10   you weren't getting any money?
11   A.    We weren't getting paychecks because
12   they didn't want to pay everybody.
13   Q.    Well, what would they be paid? The
14   money would go to the government; right?
15             MR. KIRSCHENBAUM:    Objection.
16   A.    No, I asked multiple times for the
17   proof that I have my paychecks. I wanted my
18   paychecks.
19   Q.    I understand. You wanted a
20   statement of what you were getting?
21   A.    Every week when I work, if I'm
22   paying taxes on my money, I want a paycheck.
23   Okay.
24   Q.    Even if it's no money?

1    discuss?

2         A.    I spoke to Candace more because I
3    used to hang out with Candace.

4         Q.    What's Candace's last name?

5         A.    I have no idea.

6         Q.    Okay.  And what did you guys
7    discuss?

8         A.    As far as working, just normal
9    co-worker conversation.  Just like you would talk
10   to your co-counsel, and talk about stuff that
11   goes on at your job.  It's the same way that we
12   used to talk.  I used to drive her home.  We used
13   to talk all the time about this, and about not
14   getting paid, and about working, and about we're
15   not going to get our paychecks.  Always.

16        Q.    You drove to work?

17        A.    Yes, always.

18        Q.    And where did you park?

19        A.    Right down the block.

20        Q.    What, in a parking lot?

21        A.    No.

22        Q.    What, on the street?

23        A.    Yeah.

24        Q.    And how would you get to work, what

1            So if there was a check, some
2   people, you know, they sign, and they sign their
3   credit card.  If the signature isn't where she
4   wanted the signature to be, you'd be paying that
5   whole bill.  You paid the whole bill.
6        Q.   Okay.  Now, did this happen to you?
7        A.   Definitely.
8        Q.   When?
9        A.   I don't know the date.
10       Q.   Do you know the circumstance?
11       A.   I've had a time -- I can remember
12  the date that I had in Atlantic City, because it
13  was specific.  It was Memorial Day.
14       Q.   I'm not talking about Atlantic City.
15       A.   Okay.  Well, that's a specific time
16  to me.  I worked in both places.  It's one -- one
17  place employed me.  And I worked in both places.
18  So if you're asking me a specific time that I
19  remember a large amount of a bill, the largest
20  bill that affected me that I remember
21  specifically, and the day.  It was on Memorial
22  Day weekend in Atlantic City.  And that's exactly
23  what happened to me.
24       Q.   Okay.  So in your affidavit here,

Page 128

1  you say, I had a customer walk out without
2  paying, and I had to pay the bill.  You're
3  talking about Atlantic City?
4      A.    No, that was in New York.
5      Q.    Okay.  What occasion was that?
6      A.    Just a regular night.
7      Q.    And what happened?
8      A.    The customer just got drunk, left
9  their license, and their credit card.  I was
10 working the club room.  And I got stuck with the
11 license and the credit card.  And I had to pay
12 the bill until the person came back and collected
13 it.  I never got paid for it.
14     Q.    You never got that money?
15     A.    Never.
16     Q.    Did you ask for it?
17     A.    Always asked for everything.  But
18 remember, there's no one to ask.
19     Q.    You didn't close out that tab?
20     A.    Another tab was open.  In other
21 words, some of the nights, where you say, did you
22 clock out at 6:45, that's what happened.  When
23 there's an open tab you get left there, until the
24 managers can clear up these problems.

1    Q.    What's the procedure for clearing
2    that up; do you know?
3    A.    It has to be closed somehow. Either
4    a customer or you're closing it.
5    Q.    What's the procedure for doing that?
6    How do you do that?
7    A.    Rephrase the question?
8    Q.    So when a person paid the bill then
9    it's closed?
10   A.    Yeah.
11   Q.    Okay. And if they didn't pay the
12   bill because they forgot they had left their
13   license and their credit card with you?
14   A.    You'd pay. If they didn't sign it
15   the right way, you'd pay.
16   Q.    You'd pay for the whole thing?
17   A.    The whole bill.
18   Q.    Were you given any record of the
19   people who didn't pay?
20   A.    No.
21   Q.    Who told you that they didn't pay?
22   A.    I would know it. It's my person.
23   Q.    So would you report that to
24   management, and say, this guy left?

1    A.    If somebody leaves then the credit
2  card and everything is still there.  Then they
3  still have an open tab.  If that person disputes
4  -- if that person might dispute that tab, you're
5  still liable until you do it.  And what you'll do
6  is, you'll pay it.  And then if she gets paid in
7  90 days, you have to come back, and then claim
8  your money.
9    Q.    Okay.  Let's back up a minute.  I
10 want to know what we're talking about, so I'll
11 try to ask the questions, and maybe I need to do
12 it in smaller steps, so if you don't mind.
13        At the time you serve someone with a
14 drink, you take their credit card and a driver's
15 license; yes?
16   A.    Yes.
17   Q.    So that remains in your possession?
18   A.    Yes.
19   Q.    And you also swipe that credit card
20 on the POSitouch machine?
21   A.    Just for an authorization.
22   Q.    So that's authorized payment.  And
23 at the end of the day, even if they've left --
24   A.    I don't know.

1    A.    It's the same club. It's the same
2  procedures in both clubs. I was sent there from
3  New York to Atlantic City.
4    Q.    Okay. If you can remember any time
5  when this happened to you in New York --
6    A.    No, I don't know.
7    Q.    -- please let me know.
8
9  DOCUMENT/INFORMATION REQUESTED:
10
11   Q.    Did you ever talk to anybody else
12 about their having to pay when a customer walked
13 out?
14   A.    Of course.
15   Q.    Okay. Who did you talk to?
16   A.    No one specific again.
17   Q.    You have no specific recollection of
18 any particular conversation you had with anyone
19 about this policy?
20   A.    No.
21   Q.    Did you ever pay for breakages or
22 spills?
23   A.    No, not that I remember.
24   Q.    Did you ever talk to anybody else

1  about breakages or spills?
2      A.   Yeah, people used to pay.
3      Q.   Who?
4      A.   Other bartenders, other waitresses.
5      Q.   Do you have any recollection of any
6  specific person telling you that they were
7  charged for breakage or spill?
8      A.   Nothing specific.
9      Q.   Do you recall what the credit card
10 procedure was at 40/40 Club?
11     A.   Uh-huh.
12     Q.   What is it?
13     A.   To get an imprint, preauthorize the
14 card.
15     Q.   Anything else?
16     A.   That's it.  Get signatures on the
17 authorization, and signatures on the credit card
18 bill.
19     Q.   Was there a six step procedure that
20 you're aware of?
21     A.   If I broke it down, I'd probably get
22 every procedure.
23     Q.   Okay.  Please do so.
24     A.   You take the credit card with the

1      Q.    Okay.  There would be meetings with
2  the staff on Mondays?
3      A.    Yes.
4      Q.    And what subject matters were
5  covered in those meetings?
6      A.    Whatever was going on in the club.
7      Q.    Did they discuss policies and
8  procedures?
9      A.    Definitely.
10     Q.    Did employees raise questions during
11 those meetings?
12     A.    Not really like -- yeah, we raised
13 certain questions.
14     Q.    Did -- was there ever questions
15 raised about not -- allegedly not getting pay
16 stubs?
17     A.    Once.
18     Q.    Do you remember who raised that
19 question?
20     A.    Me.
21     Q.    And what was the response?
22     A.    I better shut my mouth, because I
23 know I'm going to lose my job.
24     Q.    And who responded that?

1   the 40/40 Club where you worked more than ten
2   hours?
3        A.    I always worked long hours.
4        Q.    Okay.
5        A.    When my shift started at 4 a.m., I
6   worked more than ten hours definitely.
7        Q.    Okay.  My question is:  Do you
8   recall any specific day you worked more than ten
9   hours?
10       A.    Specific date?
11       Q.    Uh-huh.
12       A.    No.
13       Q.    But you always did?
14       A.    Not always.  Depending what time my
15  shift started.
16       Q.    Do you recall any specific time when
17  your tip was withheld for 90 days, because the
18  credit card receipt was not signed?
19       A.    Yes.
20       Q.    When was that?
21       A.    Memorial Day.
22       Q.    Any other time?
23       A.    Not the specific day, no.
24       Q.    Memorial Day, that Monday?

1       A.      No, it was Saturday.  The Saturday
2  right before Memorial Day.
3       Q.      I suppose during 2006; right?
4       A.      Yeah, I assume.
5       Q.      Do you know any other employee who
6  was -- had their tips retained for not getting a
7  credit card signed for 90 days?
8       A.      Specifically?
9       Q.      Uh-huh.
10      A.      I mean everybody got their thing --
11 I mean almost every single person, if you went
12 through her thing of withheld imprints, I would
13 say almost, not every, but almost every night
14 someone was getting something withheld.
15      Q.      And when you say "her," do you mean
16 Desiree?
17      A.      Desiree.
18      Q.      And what thing of credit card
19 imprints are you talking about?
20      A.      Say that again?
21              MR. MARKS:  Read back his answer for
22         me, please.
23
24              (The requested testimony was

1              read back.)

2

3       Q.    How do you know people had it
4  withheld?

5       A.    People were all there.

6       Q.    People were all there.  And it was
7  announced that, we're withholding this?

8       A.    It wasn't announced on a loud
9  speaker, but everybody knows.

10      Q.    Well, do you know -- can you
11 identify any other person who had their tips
12 withheld?

13      A.    I can't name a specific person with
14 a specific date, no.

15      Q.    Are there any records that you're
16 aware of that would reflect that?

17      A.    That Desiree would have.

18      Q.    Are you aware of what records
19 Desiree might have that would reflect that?

20      A.    She would have the statement with
21 the thing with the credit card.

22      Q.    Where would that be; do you know?

23      A.    I don't know.

24      Q.    Have you ever seen that?

Page 164

1    A.    No, because I never got my money
2  back.
3    Q.    Have you ever asked for your money
4  back?
5    A.    Definitely.
6    Q.    And it was denied?
7    A.    And then I ended up leaving.  So I
8  never went back because of the terms I left.
9    Q.    Okay.  Now, you claim that it's
10 common practice not to pay an overtime premium;
11 is that right?
12   A.    I really meant that it's common
13 practice not to get paid at all.  Overtime is
14 just an obvious.
15        MR. MARKS:  All right.  We're going
16    to take a break for a minute, okay.  We
17    might be able to complete this soon.
18
19           (A recess was taken.)
20
21 BY MR. MARKS:
22   Q.    After you were terminated from your
23 position at 40/40, did you apply for unemployment
24 insurance?